Ameriprise Financial Services, Inc. v. Beland

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued:  May 26, 2011          Decided: November 3, 2011)

Docket No. 10-3399

------------------------------------

IN RE AMERICAN EXPRESS FINANCIAL ADVISORS SECURITIES LITIGATION

------------------------------------

CAROL M. ANDERSON, LEONARD D. CALDWELL, DONALD G. DOBBS, KATHIE KERR, SUSAN M. RANGELEY, PATRICK J. WOLLMERING, NARESH CHAND, on behalf of himself and all others similarly situated, JOHN B. PERKINS, ELIZABETH FLENNER, GALE D. CALDWELL, RICHARD T. ALLEN, individually and on behalf of all others similarly situated,

Plaintiffs,

AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS FINANCIAL CORPORATION, AMERICAN EXPRESS FINANCIAL ADVISORS, INC., JAMES M. CRACCHIOLO,

Defendants,

AMERIPRISE FINANCIAL SERVICES, INC.,

Defendant-Appellee,

- v -

JOHN BELAND, ELAINE BELAND,

Class Members-Appellants.[*]

------------------------------------

---

[*] The Clerk of Court is directed to amend the official caption as set forth above.

Before: POOLER, SACK, and LYNCH, Circuit Judges.

Appeal from a judgment entered by the United States District Court for the Southern District of New York (Deborah A. Batts, Judge) in favor of the defendant-appellee Ameriprise Financial Services, Inc. In an arbitration before the Financial Industry Regulatory Authority, the appellants -- a married couple -- brought claims against the defendant-appellee for, inter alia, breach of fiduciary duty, breach of contract, fraud, and negligent misrepresentation related to the decline in value of various personal financial assets managed by the defendant-appellee. The defendant-appellee then moved before the district court, which had retained exclusive jurisdiction over a 2007 class-action settlement, to enforce that settlement agreement against the couple and order them to withdraw their pending arbitration claims. The court, granting the defendant-appellee's motion, determined that the appellants, who had been class members in the prior class action, had expressly released all of their arbitration claims by virtue of their failure to timely opt out of the class-action settlement. But the appellants' arbitration claims include "suitability" claims that are preserved by a carve-out clause in the settlement agreement, in addition to other claims falling outside the bounds of the class settlement and release; therefore, the district court erred in directing the appellants to withdraw their entire arbitration complaint.

2

Accordingly, we AFFIRM in part and VACATE in part the judgment of the district court, and we REMAND in part to the district court for resolution consistent with this opinion.

DAVID A. GENELLY, Vanasco Genelly & Miller (James E. Judge, of counsel), Chicago, Illinois, for Appellants.

DAVID W. BOWKER, Wilmer Cutler Pickering Hale and Dorr LLP (Sue-Yun Ahn, of counsel), Washington, D.C., for Appellee.

SACK, Circuit Judge:

This appeal requires us to address several unsettled issues concerning the effect of a class-action settlement on an individual class member's preexisting right to arbitrate certain claims. The appellants, John and Elaine Beland (the "Belands"), brought various claims before Financial Industry Regulatory Authority ("FINRA") arbitrators against Ameriprise Financial Services, Inc. ("Ameriprise"), a financial-services company, for, inter alia, breach of fiduciary duty, breach of contract, fraud, and negligent misrepresentation related to the decline in value of various financial assets owned by the Belands and managed by Ameriprise. The claims are based on Ameriprise's alleged failure to adhere to the Belands' conservative investment strategy and its "steering" of the Belands' assets into mutual funds that allowed Ameriprise to collect excessive fees.

Ameriprise answered the Belands' FINRA complaint by asserting, principally, that the Belands released their claims by

3

operation of a settlement agreement in a class-action suit that had proceeded between 2004 and 2007 in the United States District Court for the Southern District of New York. The Belands were class members in the class action, but -- in part, they allege, on the advice an Ameriprise financial advisor -- they took no action at the time of the settlement, failing to either opt out of the class or submit a claim to share in the settlement funds. By the terms of the settlement agreement, the district court (Deborah A. Batts, <u>Judge</u>) had retained exclusive jurisdiction over disputes arising from the class litigation.

After FINRA arbitrators denied Ameriprise's motion to stay the Belands' arbitration, Ameriprise moved in the United States District Court for the Southern District of New York, in which the class action had been litigated and settled, for an order to enforce the settlement agreement that would enjoin the Belands from pressing any of their claims before FINRA arbitrators. The district court concluded that the class settlement barred all of the Belands' arbitration claims, and therefore granted Ameriprise's motion and ordered the Belands to dismiss their FINRA complaint with prejudice.

We conclude that the district court had the power to enter such an order and that several of the Belands' arbitration claims were barred by the 2007 class-action settlement. We therefore affirm in part. But because we conclude that the Belands' arbitration complaint pleads claims -- including so-

4

called "suitability claims" -- that were not, and could not have been, released by the class settlement, we vacate in part the district court's judgment, and we remand the case for the entry of an order permitting the non-Released claims to proceed in FINRA arbitration.  In light of our disposition of this appeal, we dismiss as moot the Belands' appeal from the district court's denial of their motion for reconsideration.

**BACKGROUND**

The In re AEFA Class-Action Complaint

Between March 4, 2004, and May 4, 2004, various persons who had had dealings with Ameriprise[1] (the "Class Plaintiffs") brought a total of five separate class-action lawsuits before the United States District Court for the Southern District of New York against several Ameriprise affiliates.  The Class Plaintiffs asserted various federal- and common-law claims based on Ameriprise's alleged conflicts of interest, misrepresentations and omissions, biased and "canned" financial advice and advisory services, failure to disclose financial incentives and fees, and so-called "steering" of clients' money into investments that benefited the defendants without regard to their clients' best interests.  On June 25, 2004, the district court consolidated the

---

[1] On August 1, 2005, American Express Financial Corporation and American Express Financial Advisors officially changed their names to, respectively, Ameriprise Financial, Inc. and Ameriprise Financial Services, Inc.  On September 30, 2005, these two entities became independent from the American Express Company.

five class actions into <u>In re American Express Financial Advisors Securities Litigation</u> ("<u>In re AEFA</u>"), No. 04 Civ. 1773 (S.D.N.Y., consolidated June 25, 2004).

The Second Consolidated Amended Class Action Complaint (the "Class Complaint"), dated September 29, 2005, described the class action as "arising out of the failure of American Express to disclose an unlawful and deceitful course of conduct they engaged in that was designed to improperly financially advantage Defendants to the detriment of [Class] Plaintiffs and other members of the Class." Class Complaint ¶ 1, <u>In re AEFA</u>, No. 04 Civ. 1773 (S.D.N.Y. Sept. 29, 2005), ECF No. 119. The Class Plaintiffs alleged that "instead of offering fair, honest and unbiased recommendations to Plaintiffs and other investors, American Express 'financial advisors' gave pre-determined recommendations, pushing clients into a pre-selected, limited number of mutual funds in order to reap millions of dollars in secret kickbacks from the Shelf Space Funds and millions more from sales of American Express Proprietary Funds."[2] <u>Id.</u> ¶ 2. They alleged further that the defendants "had an undisclosed, material conflict of interest that made it impossible for them to render impartial advice." <u>Id.</u> ¶ 10. Based on those allegations,

---

[2] The Shelf Space Funds were mutual funds sold by companies who made undisclosed payments to American Express in order to promote their mutual funds; these payments were "referred to as buying 'shelf space' at American Express." Class Complaint ¶ 1. The Proprietary Funds were owned and operated by American Express itself. <u>Id.</u>

the Class Plaintiffs brought claims for violations of the Securities Act of 1933, the Securities Exchange Act of 1934 and various Rules promulgated thereunder, the Investment Advisers Act of 1940, and assorted state-law claims including for breach of fiduciary duty, deceptive trade practices, and unjust enrichment. The Class Period was defined as March 10, 1999, to April 1, 2004, and was later extended to April 1, 2006.

In January 2007, the lead plaintiffs in In re AEFA moved for provisional certification of a settlement class and preliminary approval of a settlement agreement pursuant to Federal Rule of Civil Procedure 23. See Stipulation of Settlement ("Class Settlement" or "Settlement Agreement"), Lead Pls.' Notice of Mot. for Prelim. Approval of Settlement Exh. 2, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Jan. 18, 2007), ECF No. 135-3. They simultaneously submitted a draft Notice of Proposed Settlement of Class Action (the "Class Notice") to the court. On February 15, 2007, the district court provisionally certified the class and approved the Class Notice. In February and March 2007, the parties mailed the Class Notice to roughly 2.8 million potential class members.

The Class Notice served several functions. First, it described the lawsuit in general terms:

> In their lawsuits, the investors complain
> that they were sold financial plans and/or
> advice that, instead of being tailored to
> their individual circumstances, contained
> standardized recommendations designed to

7

steer them into investing in Defendants' proprietary mutual funds and other proprietary investment products [(the Proprietary Funds)] and certain non-proprietary "Preferred" or "Select" mutual funds [(the Shelf Space Funds)].
. . . Plaintiffs claim that the conflicts of interest inherent in Defendants' financial plans and/or financial advisory services, and the compensation arrangements between Defendants and the Preferred Funds, were inadequately disclosed to investors. . . .

Class Notice at 1, Decl. of Jennifer M. Keough in Supp. of Final

Approval of Settlement Exh. 1, In re AEFA, No. 04 Civ. 1773

(S.D.N.Y. May 29, 2007), ECF No. 143-2.

Second, the Class Notice explained the options

available to potential class members in acting on the Class

Settlement.  In particular, as relevant here, the Class Notice

stated:  "Unless you exclude yourself, you will continue to be a

member of the class, and that means that if the settlement is

approved, you will release all 'Released Claims' against the

'Released Persons,' and you will be prohibited from bringing or

participating in any other cases concerning the 'Released Claims'

against the 'Released Persons.'"  Id. at 7.  The Class Notice

also included a description of "Released Claims" and "Released

Persons" taken from the Settlement Agreement.  The definition of

Released Claims included, inter alia,

any and all claims, debts, demands, rights or causes of action or liabilities whatsoever . . . , whether based on federal, state, local, statutory or common law or any other law, rule or regulation, . . . including both known claims and Unknown

8

> Claims . . . that (i) have been asserted in this Action by the Plaintiffs . . . or (ii) could have been asserted in any forum by the Plaintiffs or Class Members . . . against any of the Released Persons; including claims that arise out of or are based upon (a) the allegations, transactions, facts, matters or occurrences, representations or omissions alleged, involved, set forth, or referred to in the [Class Complaint] . . . .

Id. at 8.  Importantly for present purposes, the Class Notice stated that "'Released Claims' shall not include suitability claims unless such claims are alleged to arise out of the common course of conduct that was alleged, or could have been alleged, in the Action, as more fully described herein."[3]  Id.

The Class Notice further explains that releasing claims "will prevent you from suing Defendants over claims that arise from or are based on the offer and sale of financial planning services or financial advice provided to you by Defendants, including claims to recover the fees you paid for financial advisory services or advice and claims that you were 'steered'

---

[3] The phrase "common course of conduct" is not defined in the Class Settlement; neither is "suitability claim."  However, a suitability claim, generally, is a claim that a "broker knew or reasonably believed that the securities he recommended to the customer were unsuitable in light of the customer's investment objectives but that he recommended them anyway."  Murray v. Dominick Corp. of Can., 117 F.R.D. 512, 516 (S.D.N.Y. 1987).  Suitability claims -- sometimes called "unsuitability claims" -- are often brought "as a distinct subset" of section 10(b) claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).  Dodds v. Cigna Sec., Inc., 12 F.3d 346, 351 (2d Cir. 1993), cert. denied, 511 U.S. 1019 (1994); see Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1031 (2d Cir. 1993) (discussing the elements of a federal unsuitability claim).

9

toward particular investments that were more profitable for [Ameriprise]." Id. It also warned potential class members, under the heading "EXCLUDING YOURSELF FROM THE SETTLEMENT," that if "you want to retain any right to sue or continue to assert any of the Released Claims on your own against any Defendant or other Released Person, then you must take steps to get out of the class." Id.; see id. at 8-9, 11 (explaining how to "opt[] out" of the Class Settlement and the consequences of "do[ing] nothing").

On July 18, 2007, the district court issued an Order and Final Judgment in In re AEFA approving the Class Settlement, dismissing all class members' claims with prejudice, and barring and enjoining class members from asserting Related Claims against Released Persons. The court retained "[e]xclusive jurisdiction . . . over the Parties and the Class Members for all matters relating to this Action and the Settlement, including . . . [the] interpretation, effectuation, or enforcement of the [Settlement Agreement] and this Order and Final Judgment." Order and Final Judgment at 10, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. July 18, 2007), ECF No. 170.

The Belands

John and Elaine Beland are a retired married couple living on a 4.1-acre parcel of farmland in New Lenox, Illinois, that, together with a much larger tract, had been in John's family for more than a century. For many years, John, whose

10

formal education ended in eighth grade, "farmed the family homestead" for the Pesters, his aunt and uncle. Claim in Arbitration Before FINRA ("FINRA Complaint") (filed Feb. 17, 2009) ¶ 1, Decl. of David W. Bowker in Supp. of Ameriprise Fin. Servs., Inc.'s Mem. of Law in Supp. of Mot. to Enforce In re AEFA Settlement and Inj. ("Bowker Decl.") Exh. 6, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Mar. 9, 2010), ECF No. 193-7. After the death of his uncle, John continued to farm the land for his aunt, Hazel Pester.

According to the Belands, in 1995, acting on the financial advice of Ronald Miller -- an Ameriprise financial consultant based in Joliet, Illinois -- Hazel sold a large portion of the family farm for approximately $2.6 million. The proceeds of the sale were immediately deposited into two different trusts -- a charitable trust worth $1.757 million and a revocable trust worth $886,000. Hazel was the charitable trust's lifetime beneficiary, and she held a life estate in the revocable trust. In 2004, Hazel died. John Beland took the corpus of the revocable trust, while various local churches and charities, as residuary beneficiaries, received the assets in the charitable trust. John, allegedly on Miller's advice, then converted the revocable trust into an Ameriprise investment account, jointly held by the Belands and managed by Miller.

The Belands' FINRA Complaint asserts that Ameriprise and Miller agreed to invest the Belands' funds "in a conservative

11

fashion, preserving capital and obtaining income from which the life beneficiaries could receive a return." Id. ¶ 9. However, the Belands allege, "[a] conservative asset allocation approach was not taken." Id. ¶ 13. In the FINRA Complaint, the Belands express two main grievances: (1) "Miller and Ameriprise invested in many house American Express mutual funds including various high yield junk bond funds, as well as risky small cap or start-up funds";[4] and (2) "Ameriprise invested in many risky small-cap technology stocks which led to huge, significant losses over time."[5] Id. ¶¶ 14–15. They similarly contend that Ameriprise "allocat[ed] the trust assets inappropriately which left the Trusts exposed to greater than expected losses." Appellants' Br. at 7; see FINRA Complaint ¶ 27.

The Belands state that their combined account balances dwindled from more than $2.6 million at inception in 1995 to approximately $800,000 in early 2009. FINRA Complaint ¶ 7. John admits that he did not review the account statements until after Hazel's death, when he noticed the "precipitous[]" drop. Id.

---

[4] The Belands allege that "[t]hese 'house' mutual funds were purchased not because they fit the preservation of capital and income approach (with growth only a secondary feature), but because they generated fees for Ameriprise." FINRA Complaint ¶ 14.

[5] These "'tech' heavy stock" stocks included: Check Point Software; Flextronics; Analog Devices; Applied Microcircuits; Brocade Communications; Ciena Corp.; Enron Corp.; I 2 Technologies, Inc.; Maxim Integrated Products; Selectron Corp.; and Univision Communications. FINRA Complaint ¶ 16.

12

¶¶ 18–19. The Belands allege that when they confronted Miller about the accounts' declining assets, "Miller set a course of cover-up, lies and deceit in order to obscure the mishandling" of the accounts, providing false justifications for investment decisions and shielding the truth about Ameriprise's motives and conflicts of interest. Id. ¶ 20. Among the allegedly false reasons for the losses were the September 11 terrorist attacks and that the charitable trust was intended to diminish in value "by design." Id. ¶¶ 21–24 (internal quotation marks omitted).

Over time, the Belands received notices of myriad class-action lawsuits against or involving various companies in which Ameriprise and Miller had invested on the Belands' behalf. In addition, John Beland conceded that in early 2007 he received multiple notices relating to the In re AEFA action. Decl. of John Beland ¶ 5, Reply in Supp. of Mot. for Ltd. Disc. Exh. A, In re AEFA (S.D.N.Y. June 22, 2010), ECF No. 204-2. Because he found the notices, including the In re AEFA notices, "complex and confusing," he asked Miller for advice. Id. ¶ 6. According to John, "Miller told [the Belands] to do nothing about these notices and [they] followed his advice." Id. As a result of their failure to take any action with respect to the In re AEFA Class Settlement, the Belands did not share in its proceeds.[6]

---

[6] The Belands did receive a $25 payment from an SEC disgorgement and restitution fund related to its investigation into Ameriprise's investment-advisory activities.

13

The Belands' FINRA Action

In late 2008, the Belands sought legal advice regarding their accounts' declining values, and on February 17, 2009, they filed an arbitration complaint with FINRA.  They made claims (collectively, the "FINRA Claims") against Miller and Ameriprise for: (1) breach of fiduciary duty for "failing to manage the trusts according to their investment objectives, and by self-dealing," FINRA Complaint ¶ 31; (2) breach of contract for "mishandling the [Belands'] assets and . . . covering up the mishandling," id. ¶ 35; (3) common-law fraud for "mak[ing] material misstatements of fact" regarding the reasons for the assets' decline in value, among other things, id. ¶ 39; and (4) negligent misrepresentation, id. ¶ 44.  See generally id. ¶¶ 29-45.  The Belands sought an arbitration award of "not less than $1,500,000 for 'well managed' account damages . . . , for punitive damages[,] and [for] their costs and fees of [the FINRA] action."  Id. at 11.

In response before the FINRA arbitrators, Miller and Ameriprise (collectively, the "FINRA Defendants") filed a Statement of Answer, Defenses and Affirmative Defenses on September 18, 2009.  At the same time, the FINRA Defendants moved before the arbitrators to stay the arbitration proceedings on the basis that, as members of the In re AEFA class, the Belands had "released Ameriprise Financial and its agents and affiliates for" the Released Claims defined in the Class Settlement and Class

14

Notice. Mot. to Stay Arbitration of Released Claims ("Motion to Stay") at 2, Bowker Decl. Exh. 7, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Mar. 9, 2010), ECF No. 193-8. In the Motion to Stay, the FINRA Defendants listed eighteen separate Ameriprise account numbers as to which, they contended, the Belands' allegations were barred by the Class Settlement.[7] The FINRA Defendants stated in their motion that "[u]nless Claimants withdraw their Released Claims in this action, Respondents will be forced to protect their rights by filing a Motion to Enforce Class Action Settlement as to the Released Claims," and that, therefore, "a stay of th[e FINRA] action as it pertains to the released claims is appropriate." Id. at 4. On October 27, 2009, the Belands filed an opposition to the FINRA Defendants' Motion to Stay, arguing that the "class action specifically excluded the causes of action the Belands assert" in the FINRA arbitration. Claimants' Opp'n to Resp'ts' Mot. to Stay Arbitration at 2, Bowker Decl. Exh. 4, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Mar. 9, 2010), ECF No. 193-5.

A three-member FINRA arbitration panel held a telephonic hearing regarding the Motion to Stay on January 5,

---

[7] In a July 28, 2009 letter, the FINRA Defendants requested that the Belands "withdraw their claims related to" the eighteen accounts listed. Letter from Ameriprise Counsel to Belands at 2, Mem. in Supp. of Mot. for Reconsideration ("Mot. for Reconsideration") Exh. D, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Aug. 17, 2010), ECF No. 209-5. The Belands have identified seven of their Ameriprise accounts that were not listed in the July 28 letter or the Motion to Stay.

2010.  After the hearing, the panel issued an order denying the Motion to Stay "without prejudice."  FINRA Order at 1, Mem. in Supp. of Mot. for Reconsideration ("Mot. for Reconsideration") Exh. F, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Aug. 17, 2010), ECF No. 209-5.  The panel then scheduled an arbitration hearing for March 2010[8] to try the issues raised in the Belands' FINRA Complaint and the FINRA Defendants' answer.

### Ameriprise's Motion to Enforce the Class Settlement in the S.D.N.Y. and Belands' Cross-Motion to Clear Technical Defaults and for Limited Discovery

Before the scheduled arbitration hearing could be held, however, the FINRA Defendants filed a "Motion to Enforce"[9] the In re AEFA Settlement Agreement before the district court, which had

---

[8] The Belands represent that the FINRA arbitrators originally set the arbitration hearing for March 2010; however, the hearing was eventually rescheduled to take place in August 2010.  **[Blue 14; A329.]**  It was thereafter postponed indefinitely pending the resolution of the parties' litigation before the district court.

[9] In Martens v. Thomann, 273 F.3d 159 (2d Cir. 2001), we noted that "there is nothing in the Federal Rules of Civil Procedure styled a 'motion to enforce.'  Nor is there approval for such a motion to be found in this Circuit's case law, except in situations inapposite to the case before us." Id. at 172. In Martens, we did "not ourselves define the nature of this motion because the district court's failure to state its reasons for denying it [wa]s sufficient to warrant reversal." Id.

From time to time, however, we have reviewed district-court judgments that ruled on purported motions to enforce. See, e.g., Vemics, Inc. v. Meade, 371 F. App'x 181 (2d Cir. 2010) (summary order); Surac v. Cavalry Portfolio Servs., LLC, 357 F. App'x 344 (2d Cir. 2009) (summary order).  Because we conclude that the district court's judgment in this case presents an appealable question to this Court, we choose to ignore any potential error of terminology here.

16

retained jurisdiction over the In re AEFA class litigation. In their March 9, 2010 Motion to Enforce, the FINRA Defendants requested that the court "order[] the Belands to dismiss with prejudice their pending FINRA action against Ameriprise."[10] Mem. in Supp. of Ameriprise's Mot. to Enforce In re AEFA Settlement and Inj. ("Motion to Enforce") at 2, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Mar. 9, 2010), ECF No. 192. The Belands did not, in response, file a direct opposition to the motion. Instead, they filed a cross-motion, styled as a "Motion to Clear Technical Defaults [and] for Limited Discovery," seeking to litigate the issue of whether the Class Settlement's definition of Released Claims covered all of the claims that the Belands asserted in their FINRA Complaint. Specifically, the Belands argued that depositions should be taken to determine whether evidence supported their assertion that "Miller's conduct . . . deprived them of any meaningful opportunity to opt out of the class action," as well as to determine which of their investments did

---

[10] The Belands argue that the FINRA Defendants qualitatively altered their position in the Motion to Enforce vis-à-vis the In re AEFA Class Settlement's effect on the Belands' FINRA Complaint because that document represented "the first time" that Ameriprise had argued "that all claims and facts alleged in the Illinois Arbitration were of the same 'course of conduct' alleged in the New York Class Action." Appellants' Br. at 15 (emphasis in original). The Belands also characterize the Motion to Enforce as misleading because it argued that the Belands sought a "double recovery" despite the fact that they had not received any payments from the Class Settlement, and because it did not indicate that the FINRA panel had denied the FINRA Defendants' Motion to Stay. Id. (internal quotation marks omitted).

17

"not fall within the ambit of the" Class Settlement. Mot. to Clear Technical Defaults, for Ltd. Disc. and to Set Briefing Schedule at 2, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Mar. 30, 2010), ECF No. 196. The Belands proposed a deposition and briefing schedule that would culminate in an evidentiary hearing before the district court. The FINRA Defendants opposed the cross-motion by arguing, principally, that even the facts as alleged by the Belands would not, under the "excusable neglect" standard, justify their failure to opt out of the Class Settlement.

The Belands filed a reply, arguing that the district court

> should allow the arbitration to proceed for two reasons: first, because the issues of Miller's breach of fiduciary duty and misrepresentation go well beyond any issue that was or could have been raised in the Class Action; and second, because the arbitration panel is uniquely positioned to make factual determinations as to which accounts may or may not be encompassed within this Court's Confirmation Order.

Reply in Supp. of Mot. for Ltd. Disc. at 1-2, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. June 22, 2010), ECF No. 204. Finally, the FINRA Defendants filed, together, a reply in support of their Motion to Enforce and a sur-reply in opposition to the Belands' cross-motion.

18

In a seven-page order dated August 11, 2010 (the "Enforcement Order"), the district court granted the FINRA Defendants' Motion to Enforce and ordered the Belands to dismiss with prejudice their pending FINRA Complaint against Ameriprise and Miller. The court concluded that the Belands' claims "f[ell] within the definition of 'Released Claims' barred by the Court's July 18, 2007 Order." Enforcement Order at 1–2, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Aug. 11, 2010), ECF No. 206. The court characterized the Belands' FINRA Claims thus:

> Here, the Belands claim that rather than managing their accounts in a conservative, minimal risk manner as promised, Miller and Ameriprise invested in many house American Express mutual funds including various high yield junk bond funds, as well as risky small cap or start-up funds in order to generate fees for Ameriprise and promote in-house mutual funds of American Express.

Id. at 2 (brackets and internal quotation marks omitted). The court concluded that those "allegations arise from the same transactions, facts, matters, occurrences, and representations as the claims of the [Class Complaint]." Id.

The district court further determined that the Belands could not "satisfy the standard for 'excusable neglect'" to excuse their failure to opt out of the Class Settlement. Id. at 3. In arriving at that conclusion, the court stated that "while Miller's advice may have played a role in the Belands' decision not to opt out of the class, the Belands should have known from

19

the plain English of the [Class] Notice that Miller's recommendation that they 'do nothing' would lead to no payment from the settlement and the release of future claims." Id. at 5. The court also found that "not until after Ameriprise moved to enjoin [the Belands'] FINRA claims on March 9, 2010" did the Belands "argue before this Court that they should be excused from failing to opt out of the settlement" -- a delay that was, in the court's view, "inexcusably long." Id. at 6.

After the district court issued the Enforcement Order, the Belands filed a Motion for Reconsideration, making several arguments. First, they contended that the Enforcement Order "simply overlooked material language in the Release which exempts claims like the Belands['] which do not relate to the allegations of the Class Action . . . but instead raise independent suitability claims."[11] Second, the Belands argued that the Federal Arbitration Act ("FAA") required that the FINRA Defendants arbitrate the coverage of the Class Settlement before the arbitrators. Third, the Belands further elaborated a theory of "excusable neglect" that would free their claims from the Class Settlement even if those claims were Released Claims. The district court denied the Motion for Reconsideration in a two-sentence order dated August 20, 2010.

---

[11] Ameriprise contends that this argument, and others in the Belands' Motion for Reconsideration, were made "[f]or the first time" in that motion. Appellee's Br. at 17.

20

The Belands' Appeal

The Belands filed a Notice of Appeal on August 23, 2010. The same day, the district court granted a stay of its Enforcement Order pending the appeal to this Court. The stay remains in effect.

**DISCUSSION**

I. Overview

On appeal, the Belands argue that the district court erred in several respects. Principally, they assert that the court "failed to compare" the substance of the claims alleged in their FINRA Complaint -- "which feature unsuitability, lack of asset allocation and speculative 'tech' stock investing" -- with the Released Claims in the Class Settlement. Appellants' Br. at 19. In the Belands' view, the Class Settlement only released claims regarding "the sale of fee-based, 'standardized' investment adviser plans which steered customers to 'proprietary' or 'preferred' mutual funds for which Ameriprise received 'kickbacks.'" Id. They also point to a "carve[]-out" in the Class Settlement that they contend exempts at least some of their FINRA Claims. Id. For these reasons, the Belands contend that at least some of their arbitration claims are not Released Claims, and that the district court erred in requiring the Belands to dismiss those unreleased claims.

Alternatively, the Belands argue: (1) that Ameriprise chose to defend the Belands' claims before FINRA arbitrators and,

21

therefore, the district court erred in "derail[ing]" the pending FINRA arbitration; (2) that questions concerning the scope of the Settlement Agreement were for the FINRA arbitrators to decide, and that the arbitrators indicated their intent to decide them; (3) that the Release contained in the Class Settlement should not be applied against the Belands because their failure to opt out of the class action was the product of "excusable neglect"; and (4) that the district court erroneously denied their motion for reconsideration.  Id. at 19–22.

The FINRA Defendants (also collectively "Ameriprise") argue that the Class Settlement's release of "'suitability claims' arising out of the common course of conduct alleged in In re AEFA" precludes the entirety of the Belands' arbitration claims.  Appellee's Br. at 18.  Ameriprise also responds that the district court properly rejected the Belands' "excusable neglect" argument, and that "the district court ha[d] exclusive jurisdiction to enforce the [Class] Settlement."  Id. at 18–19. The FINRA Defendants therefore contend that the district court acted properly in directing the Belands to dismiss all of their arbitral claims.

This appeal presents at least one unresolved legal issue about which the parties are in agreement.  Neither the Belands nor Ameriprise appear to dispute the general principle that federal courts are vested with power under the FAA to enjoin a pending arbitration where appropriate.  But this question has

never been explicitly resolved by this Court,[12] and we, therefore, address it in the course of our analysis.  We also reiterate this Court's recent holding that FINRA-membership constitutes an agreement to arbitrate disputes under FINRA's rules, see UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., --- F.3d ----, 2011 WL 4389991, at *5, 2011 U.S. App. LEXIS 19420, at *15 (2d Cir. Sept. 22, 2011), a proposition neither of the parties contests.

### II. Arbitrability of the Belands' Claims

### A. Background Arbitration Law

The FAA creates a "body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  The FAA provides that an arbitration provision in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Further, the FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution" and

---

[12] Recently, in Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Fund, --- F.3d ----, 2011 WL 5110122, 2011 U.S. App. LEXIS 21885 (2d Cir. Oct. 28, 2011), in a dispute involving FINRA arbitrability, we remanded for the district court to "enjoin[ the defendant] from proceeding with its FINRA arbitration," but we did not address the procedural propriety of such an order. Id. at *9, 2011 U.S. App. LEXIS 21885, at *25.

"supplies not simply a procedural framework applicable in federal courts" but "also calls for the application, in state as well as federal courts, of federal substantive law regarding arbitration."  Preston v. Ferrer, 552 U.S. 346, 349 (2008).

"[T]he FAA's primary purpose [is to] ensur[e] that private agreements to arbitrate are enforced according to their terms."  Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 479 (1989).  Despite the "liberal federal policy favoring arbitration agreements," Moses H. Cone, 460 U.S. at 24, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)) (internal quotation marks omitted); see also Volt, 489 U.S. at 479 ("Arbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.").  "[A]s with any other contract, the parties' intentions control."  Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1774 (2010) (internal quotation marks omitted).

However, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Moses H. Cone, 460 U.S. at 24-25.  "Accordingly, federal policy requires us to construe arbitration clauses as broadly as possible."

24

_Collins & Aikman Prods. Co. v. Bldg. Sys., Inc._, 58 F.3d 16, 19 (2d Cir. 1995) (brackets and internal quotation marks omitted). Therefore, we will compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." _AT & T Techs., Inc. v. Commc'ns Workers of Am._, 475 U.S. 643, 650 (1986).

In this Circuit, courts follow a two-part test to determine the arbitrability of claims. In deciding whether claims are subject to arbitration, a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement. _ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co._, 307 F.3d 24, 28 (2d Cir. 2002); _accord_ _John Hancock Mut. Life Ins. Co. v. Olick_, 151 F.3d 132, 137 (3d Cir. 1998). Before addressing the second inquiry, we must also determine who -- the court or the arbitrator -- properly decides the issue. _See_ _Republic of Ecuador v. Chevron Corp._, 638 F.3d 384, 393 (2d Cir. 2011).

B. Existence and Scope of Ameriprise's Consent to Arbitrate

Because our review of the district court's Enforcement Order requires that we evaluate not only the existence but also the scope of any such agreement, we must identify first that agreement's form, and then its contours.

25

Ameriprise does not dispute that, by virtue of its membership in FINRA, it has consented to arbitrate with its customers.[13]  See FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Code") § 12200 ("Parties must arbitrate a dispute under the [FINRA] Code if" arbitration is "[r]equested by the customer; [t]he dispute is between a customer and a [FINRA] member or associated person of a member; and [t]he dispute arises in connection with the business activities of the member or the associated person . . . ."); cf. John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 58 (2d Cir. 2001) (explaining that the defendant "concede[d] that it agreed by virtue of its membership in the NASD[, the predecessor to FINRA,] to arbitrate all disputes contemplated under" a rule analogous to FINRA Rule 12200).  Nor does Ameriprise dispute that all of the Belands' claims constitute claims "aris[ing] in connection with [its] business activities" within the meaning of FINRA Rule 12200. This Court has recently stated that FINRA membership constitutes an agreement to "adhere to FINRA's rules and regulations, including its Code and relevant arbitration provisions contained therein." UBS Fin. Servs., 2011 WL 438991, at *5; see also

_____

[13] We note that such consent may not be reciprocal.  Though the FINRA Rules bind Ameriprise to arbitrate disputes with its customers upon request, it does not appear that Ameriprise can require its customers to arbitrate disputes with it on the basis of its FINRA membership alone.  Hence, for example, the In re AEFA litigation, which proceeded in federal court, not in FINRA arbitration.

*Wachovia Bank*, 2011 WL 5110122, at *6-7, 2011 U.S. App. LEXIS 19420, at *15 (stating that "interpretation of arbitration rules of an industry self-regulatory organization. . . such as FINRA is similar to contract interpretation" and concluding, in that case, that the matter was not arbitrable under FINRA's rules).  We therefore conclude that all of the Belands' FINRA Claims against Ameriprise are arbitrable in the absence of any subsequent agreement revoking or otherwise limiting the scope of Ameriprise's consent to arbitrate.

III. Binding Nature of the Class Settlement on the Belands

We next turn to the parties' relationship to the Class Settlement.  Absent a violation of due process or excusable neglect for failure to timely opt out, a class-action settlement agreement binds all class members who did not do so.  See, e.g., *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 115 (2d Cir. 2005) (stating that a class member "was required to opt out at the class notice stage if it did not wish to be bound" by a class settlement agreement), cert. denied, 544 U.S. 1044 (2005); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1302 (2d Cir. 1990) (stating that if a party "could not have properly opted out of the mandatory class, it is bound by the class settlement if it is upheld, as are all other members of the class"); see also *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-13 (1985); *In re: PaineWebber Ltd. P'ships Litig.*, 147 F.3d

27

132, 138-39 (2d Cir. 1998). And a "settlement agreement is a contract that is interpreted according to general principles of contract law." Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 443 (2d Cir. 2005).

Rule 6 of the Federal Rules of Civil Procedure permits a court to extend the time during which an act must be done "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). In Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993), the Supreme Court set forth four factors to be considered in connection with an assertion of "excusable neglect" as justification for a missed judicial deadline: (1) "the danger of prejudice" to the party opposing the extension; (2) "the length of the delay and its potential impact on judicial proceedings"; (3) "the reason for the delay, including whether it was within the reasonable control" of the party seeking the extension; and (4) whether the party seeking the extension "acted in good faith." Id. at 395. While those factors are the central focus of the inquiry, the ultimate determination depends upon a careful review of "all relevant circumstances." Id.; accord In re: PaineWebber Ltd. P'ships Litig., 147 F.3d at 135 ("To establish excusable neglect, . . . a movant must show good faith and a reasonable basis for noncompliance.").

Because the Belands have not argued that due process was denied them with respect to the Class Settlement, we turn to

28

whether the district court erred when it rejected their "excusable neglect" argument. On review of the district court's ruling for abuse of discretion, see id. at 135, we will reverse only if we have "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion that it reached upon a weighing of the relevant factors," Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 362 (2d Cir. 2003), cert. denied, 540 U.S. 1105 (2004). Because we have no such clear conviction here, we do not disturb the district court's conclusion that the Belands failed to demonstrate "excusable neglect."

In analyzing the issue, the district court relied on admonitions and warnings under boldface, capitalized headings in the Class Notice -- which the Belands received -- about the consequences of taking no action. The court concluded that "the Belands should have known from the plain English of the Notice that Miller's recommendation that they 'do nothing' would lead to no payment from the settlement and the release of future claims." Enforcement Order at 5. It also determined that if the Belands failed to read the notice, even after Miller's alleged advice, they did so unreasonably. The court further noted a significant delay on the Belands' part in seeking relief under the "excusable neglect" standard, even after they became aware of their possible error in failing to opt out of the Class Settlement.

We conclude that the court's decision in this regard did not constitute an abuse of its discretion. The Class Notice is a reasonably straightforward document that contains a list of readable questions and answers discussing the content of the Class Action and the consequences of taking, or not taking, action in response. See Wal-Mart, 396 F.3d at 114 (stating that a class "[n]otice is adequate if it may be understood by the average class member" (internal quotation marks omitted)). And the Class Notice itself offered advice from class counsel, providing lawyers' contact information and instructing class members to contact them should the content of the Class Notice be unclear. There is, moreover, little doubt that Ameriprise would suffer prejudice if the Belands were permitted to opt out of the Class Settlement three years late, as it would be exposed to liability that it had every reason to think had been foreclosed by the entry of the Settlement Agreement in federal court.

Neither the length of, nor the reasons for, the Belands' delay counsel otherwise. Even if John Beland's lack of an extended formal education rendered the Class Notice incomprehensible to him, the fact that he brought the document to Miller -- the representative of Ameriprise -- for advice suggests that he had some level of awareness of the Notice's importance. And while the Belands explain their delay by asserting that they had relied on advice from Miller that the Belands should take no action with respect to the class-action lawsuit against

30

Ameriprise, we agree with the district court's implicit conclusion that any such reliance was unreasonable. Applying the reasoning of a district court in another circuit, "[o]nce [the Belands] knew that there was a legal proceeding pending, it was no longer reasonable [for them] to continue taking legal or investment advice from [Ameriprise] or any of its agents." In re VMS Sec. Litig., 156 F.R.D. 635, 640 (N.D. Ill. 1994) (internal quotation marks omitted); see also id. ("[R]elying on one's adversaries rather than one's attorney for advice is an error that is to be laid at the feet of the one who made it; such reliance is not reasonable, particularly when the notice instructed class members to consult with their own counsel or class counsel if they had questions." (internal quotation marks omitted)). Finally, the Belands do not contend that Miller took any action to limit their ability to consult with a lawyer or ask for outside advice.

We therefore reject the Belands' contention that the district court abused its discretion as to its application of the "excusable neglect" standard to their factual circumstances. It follows from that conclusion that the Belands were bound as class members by the In re AEFA Class Settlement.

31

## IV. Effect of the Class Settlement on the Agreement to Arbitrate

### A. Question of Arbitrability

The Supreme Court has distinguished between "question[s] of arbitrability," which are "issue[s] for judicial determination[, u]nless the parties clearly and unmistakably provide otherwise," AT & T Techs., 475 U.S. at 649; see also First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995); PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198-99 (2d Cir. 1996), and "other gateway matters, which are presumptively reserved for the arbitrator's resolution," Republic of Ecuador, 638 F.3d at 393 (internal quotation marks omitted). Among "questions of arbitrability" presumptively reserved for a court, the Supreme Court has identified "dispute[s] about whether the parties are bound by a given arbitration clause" and "disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy."[14] Howsam, 537 U.S. at 84.

---

[14] On the other hand, "'"procedural" questions which grow out of the dispute and bear on its final disposition' are presumptively not for the judge, but for an arbitrator, to decide." Howsam, 537 U.S. at 84 (emphasis in original) (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964)). Likewise, "the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'" Id. (alteration in original) (quoting Moses H. Cone, 460 U.S. at 24-25).

The principal issue in this case is whether any of the Belands' FINRA Claims survived the Class Settlement and are thus still subject to arbitration. As a preliminary matter, however, we must first determine whether the court or the arbitrator should answer that question. We conclude that such an inquiry is a "question of arbitrability" that is reserved to the court.

First, the Class Settlement did not merely resolve certain claims that class members might have had, thus estopping these class members from arbitrating these claims at a later date. As discussed further below, the Class Settlement <u>revoked</u> Ameriprise's consent to arbitrate certain claims. The question therefore is not whether those claims had been settled, thus precluding arbitration, but whether there was a surviving agreement, following the settlement, to arbitrate those claims at all. That question, "[u]nless the parties clearly and unmistakably provide otherwise. . . is to be decided by the court, not the arbitrator." <u>AT & T Techs.</u>, 475 U.S. at 649. <u>But cf. Republic of Ecuador</u>, 638 F.3d at 393 (observing that "waiver and estoppel generally fall into [the] group of issues presumptively for the arbitrator").

Second, Ameriprise's FINRA membership cannot serve as such "clear[] and unmistakabl[e]" evidence of the parties' intent that all future questions of arbitrability be submitted to arbitrators. <u>See</u> <u>Wilson</u>, 254 F.3d at 57 ("[O]ne party's

33

membership in an exchange[] is insufficient, in and of itself, to evidence the parties' clear and unmistakable intent to submit the 'arbitrability' question to the arbitrators.").

Third, the district court explicitly retained jurisdiction over the In re AEFA class action. See Order and Final Judgment at 10 (providing that "[e]xclusive jurisdiction is hereby retained over the Parties and the Class Members for all matters relating to this Action and the Settlement" (emphasis added)).

For those reasons, we conclude that determining the scope of the Belands' entitlement to arbitrate (by virtue of Ameriprise's consent through its FINRA membership) is a question for judicial resolution. As such, the district court properly

undertook it on Ameriprise's motion.[15]  The question remains

[15] The Belands also argue on appeal that Ameriprise "submitted the question of the Class Action Settlement Release to the FINRA arbitrators to decide" by filing an answer in the FINRA arbitration and propounding discovery to the Belands while proceedings were pending in that venue.  Appellants' Br. at 36; see also Appellants' Reply Br. at 13.  They argue that Ameriprise's participation in the FINRA proceedings definitively precluded it from later resorting to federal court to seek an order of dismissal as to the Belands' FINRA arbitration.  In short, the Belands argue waiver.

But the actual conduct of Ameriprise in the FINRA proceedings fails to support either the Belands' characterization or their conclusion.  In a letter to the Belands' counsel dated July 28, 2009 -- after the Belands filed their FINRA Complaint but before the FINRA Defendants took any action before the arbitrators -- Ameriprise's attorney identified the In re AEFA Settlement and argued that the Belands, as Class Members, had "released Ameriprise . . . and its agents and affiliates for claims relating to the" Belands' Ameriprise investment accounts.  Letter from Ameriprise Counsel to Belands at 1, Mem. in Sup. of Mot. for Reconsideration Exh. D, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Aug. 17, 2010), ECF No. 209-5.  When the Belands refused to withdraw their FINRA Claims, Ameriprise sought principally to stay the FINRA proceedings while simultaneously filing an Answer to the Belands' FINRA Complaint.  See Motion to Stay at 1–4.  The Motion to Stay explicitly reserved Ameriprise's right to seek relief in the federal district court pursuant to the In re AEFA Settlement, requesting a stay of the FINRA proceedings in order to avoid "a waste of time and other resources."  Id. at 4.  In the same document, Ameriprise warned that "[u]nless Claimants withdraw their Released Claims in this action, Respondents will be forced to protect their rights by filing a Motion to Enforce Class Action Settlement as to the Released Claims" in federal court.  Id.

By simultaneously filing a motion to stay the FINRA proceedings with its answer to the Belands' FINRA Complaint, Ameriprise unambiguously expressed its intention to seek judicial relief and thereby preserved its right to proceed accordingly, notwithstanding its filing of a substantive answer in the FINRA arbitration.  See Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 369 (2d Cir. 2003) (where a party's correspondence with its adversary demonstrates "that it continuously objected to

35

whether its ultimate conclusion was correct.

## B. Scope of Ameriprise's Agreement to Arbitrate

We have said that "there is nothing irrevocable about an agreement to arbitrate." Baker & Taylor, Inc. v. AlphaCraze.com Corp., 602 F.3d 486, 490 (2d Cir. 2010) (per curiam) (brackets, ellipsis, and internal quotation marks omitted). Parties may "limit the issues they choose to arbitrate," Stolt-Nielsen, 130 S. Ct. at 1774, and "[n]othing" prevents parties to an agreement "from excluding . . . claims from the scope of an agreement to arbitrate," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985). Such limitations and exclusions need not be specified by the initial agreement to arbitrate. "Both of the parties may abandon this method of settling their differences, and under a variety of circumstances one party may waive or destroy by his conduct his right to insist upon arbitration." Baker & Taylor, 602 F.3d at 490 (internal quotation marks omitted). In particular, as relevant here, "different or additional contractual arrangements for arbitration can supersede the rights conferred on [a] customer by virtue of [a] broker's membership in a self-regulating organization such as [FINRA]." Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship, 41 F.3d 861, 864 (2d Cir. 1994)

arbitration," those "objections prevent a finding of waiver"). The Belands' waiver argument therefore fails.

36

(citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis, 903 F.2d 109, 113 (2d Cir. 1990)).

The Class Settlement in this case -- by which, as discussed above, the Belands are bound -- is one such "different or additional contractual arrangement[]."  Id.  "[A]n arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution."  Stolt-Nielsen, 130 S. Ct. at 1774.  It follows that where a party initially consents (in this case, by dint of Ameriprise's FINRA membership) to arbitrate certain types of claims, but later enters into a settlement agreement that releases claims that had been subject to the initial consent to arbitrate, the claims that have been released by such a settlement are no longer subject to arbitration.

In the case before us, the Belands failed to opt out of the class, and (as explained above) have not demonstrated "excusable neglect" for that failure.  Therefore, bound by the Class Settlement and Release, the Belands may not pursue any Released Claims against Ameriprise and its employees.  And the Class Settlement "supersedes all prior understandings, communications, and agreements with respect to the subject of this Settlement," Settlement Agreement at 34, including the parties' implicit agreement that the Belands had a right to arbitrate certain claims against Ameriprise by virtue of the

37

latter's FINRA membership. In other words, the Class Settlement extinguished not only the ability of Class Members to bring Released Claims against Ameriprise as a matter of substance, but also the Class Members' right to arbitrate those claims.

We find support for this conclusion in the Tenth Circuit's opinion in Riley Manufacturing Co. v. Anchor Glass Container Corp., 157 F.3d 775 (10th Cir. 1998). There, a "merger clause" in a settlement agreement purported to "cancel[], terminate[] and supersede[] any and all prior representations and agreements relating to the subject matter" of the agreement. Id. at 778. The court concluded that the merger clause "revoked the prior right of the parties to demand arbitration on the[] specific topics" that the court concluded were within the bounds of the settlement agreement. Id. at 784; see id. at 782 (concluding that "the specific releases in" the settlement agreement "waive[d the plaintiff's] right to demand arbitration on the five topics explicitly listed" in the agreement); see also Miller v. Runyon, 77 F.3d 189, 194 (7th Cir. 1996) ("Given the contractual nature of arbitration, it can be argued that the preclusive effect of either a judicial judgment or an arbitration award on a subsequent arbitration should depend on what the parties agreed to. And then the court will decide as a matter of interpretation of the parties' [agreement to arbitrate] whether

38

the arbitrators can ignore a prior judicial judgment." (citations omitted)), <u>cert. denied</u>, 519 U.S. 937 (1996).

We agree with the Tenth Circuit's approach. We conclude that the Belands' entitlement to arbitrate disputes with Ameriprise, arising out of Ameriprise's FINRA membership and defined by Rule 12200, does not extend to the Released Claims defined by the Settlement Agreement because the Settlement Agreement amended the contours of the parties' agreement to arbitrate all disputes between them before FINRA arbitrators.

## C. District Court's Retention of Jurisdiction over <u>In re AEFA</u>

We do not suggest, however, that in <u>all</u> cases, a settlement agreement revokes a prior agreement or consent to arbitrate by releasing claims that would have been subject to arbitration under the earlier agreement or consent. Indeed, "[u]nder our cases, if there is a reading of the various agreements that permits the [a]rbitration [c]lause to remain in effect, we must choose it." <u>Bank Julius Baer & Co. v. Waxfield Ltd.</u>, 424 F.3d 278, 284 (2d Cir. 2005).[16] However, no such reading is possible here because the Settlement Agreement

---

[16] In <u>Bank Julius</u>, we concluded that a forum-selection clause could "be read, consistent with the [a]rbitration [a]greement, in such a way that the [parties] are required to arbitrate their disputes," with limitations as to available challenges regarding jurisdiction and venue. <u>Bank Julius</u>, 424 F.3d at 285. In short, we found no irremediable conflict between the clauses under analysis in that case.

explicitly vests the district court with exclusive jurisdiction to enforce its terms.

A federal court does not automatically retain jurisdiction to hear a motion to enforce or otherwise apply a settlement in a case that it has previously dismissed. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380-82 (1994). Such motions are essentially state-law contract claims to be litigated in the state courts. See id. at 382. However, where, in a federal court, the court makes "the parties' obligation to comply with the terms of the settlement agreement . . . part of the order of dismissal -- either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order" -- the proper forum for litigating a breach is that same federal court. Id. at 381; accord Perez v. Westchester County Dep't of Corr., 587 F.3d 143, 151-53 (2d Cir. 2009). In cases over which "the district court retain[s] jurisdiction, it necessarily ma[kes] compliance with the terms of the [settlement] agreement a part of its order so that 'a breach of the agreement would be a violation of the order.'" Roberson v. Giuliani, 346 F.3d 75, 82 (2d Cir. 2003) (quoting Kokkonen, 511 U.S. at 381). Further, this Court has said that where "there is ample evidence. . .that the District Court 'intended to place its "judicial imprimatur" on [a]

settlement,'" the court retains jurisdiction to oversee the enforcement of the agreement.  <u>Perez</u>, 587 F.3d at 152 (quoting <u>Torres v. Walker</u>, 356 F.3d 238, 244 n.6 (2d Cir. 2004) (dicta)).

That policy interest takes on particular importance in the context of class actions, which are complicated, expensive proceedings involving a multitude of different parties and potential parties but intended ultimately to make enforcement of the rights of all the parties more efficient and less expensive. As a general matter, the more loose ends that remain after the litigation has been resolved, the less successful the process has been.  A district court therefore "has the power to enforce an ongoing order against relitigation so as to protect the integrity of a complex class settlement over which it retained jurisdiction."  <u>In re Prudential Ins. Co. of Am. Sales Practice Litig.</u>, 261 F.3d 355, 367-68 (3d Cir. 2001); <u>see also</u> <u>In re Gen. Am. Life Ins. Co. Sales Practices Litig.</u>, 357 F.3d 800, 803 (8th Cir. 2004) (recognizing "the authority of district courts to enforce by injunction a final judgment embodying the terms settling a class action").

In the Enforcement Order requiring the Belands to dismiss their arbitration complaint in its entirety, the district court did not advert to any specific source of its jurisdiction to issue the Enforcement Order.  In approving the Settlement Agreement and dismissing the <u>In re AEFA</u> litigation, though, the

41

district court had explicitly stated that "[e]xclusive jurisdiction is hereby retained over the Parties and the Class Members for all matters relating to this Action and the Settlement." Order and Final Judgment at 10. Therefore, despite the fact that the district court did officially "'close[]' and dismiss[] with prejudice" the In re AEFA litigation, Endorsed Letter at 1, In re AEFA, No. 04 Civ. 1773 (S.D.N.Y. Feb. 2, 2009), ECF No. 190, the court properly retained jurisdiction to hear the kind of issues relating to the Settlement Agreement's Released Claims raised by the Belands in this case. See Perez, 587 F.3d at 151–52.

We have found no "reading of the various agreements" at issue in this case that would permit Ameriprise's preexisting and broad consent to arbitrate "to remain in effect," Bank Julius, 424 F.3d at 284, in its entirety. Unlike the integrated reading we afforded the forum-selection clause and anterior arbitration agreement in Bank Julius, an interpretation of the Settlement Agreement that would permit the Belands to arbitrate Released Claims would run afoul of the district court's Order and Final Judgment. We arrive at this conclusion even though we approach it "with a healthy regard for the federal policy favoring arbitration." Moses H. Cone, 460 U.S. at 24. Though we must resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration," including when "the

42

problem at hand is the construction of the contract language itself," id. at 24-25; accord WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997), we are satisfied that no such doubt exists here.  In other words, "it may be said with positive assurance" that Ameriprise's consent to arbitrate as reflected in FINRA Rule 12200 -- subsequent to amendment by the Settlement Agreement -- "is not susceptible of an interpretation that covers the asserted dispute" surrounding the Released Claims.  AT & T Techs., 475 U.S. at 650.

V. Settlement Agreement & Released Claims

A. Standard of Review

In reviewing a district court's interpretation of the terms of a settlement agreement, we review conclusions of law de novo and findings of fact for clear error.  See Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir. 1997).

B. Interpreting Class-Action Settlement Agreements

It is elementary that a settlement agreement cannot release claims that the parties were not authorized to release. See Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch., 660 F.2d 9, 19 (2d Cir. 1981).  At the same time, "[t]he law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct."  Wal-

43

Mart, 396 F.3d at 107 (quoting TBK Partners, Ltd. v. W. Union Corp., 675 F.2d 456, 460 (2d Cir. 1982)); cf. TBK Partners, 675 F.2d at 461 ("[W]here there is a realistic identity of issues between the settled class action and the subsequent suit, and where the relationship between the suits is at the time of the class action foreseeably obvious to notified class members, the situation is analogous to the barring of claims that could have been asserted in the class action. Under such circumstances the paramount policy of encouraging settlements takes precedence.").

Indeed, "[c]lass actions may release claims, even if not pled, when such claims arise out of the same factual predicate as settled class claims." Wal-Mart, 396 F.3d at 108. And "in order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action." TBK Partners, 675 F.2d at 460.

C. Overlap of Claims

We begin by noting that the starting point for interpreting settlement agreements is general contract-law principles. See, e.g., Omega Eng'g, 432 F.3d at 443.

Here, the Class Settlement stated that the definition of Released Claims included, inter alia,

44

> any and all claims, debts, demands, rights or causes of action or liabilities whatsoever . . . , whether based on federal, state, local, statutory or common law or any other law, rule or regulation, . . . including both known claims and Unknown Claims . . . that (i) have been asserted in this Action by the Plaintiffs . . . or (ii) could have been asserted in any forum by the Plaintiffs or Class Members . . . against any of the Released Persons; including claims that arise out of or are based upon (a) the allegations, transactions, facts, matters or occurrences, representations or omissions alleged, involved, set forth, or referred to in the [Class Complaint] . . . , [and] (b) the offer and sale of financial advice, financial planning, and/or financial advisory services pursuant to a Financial Advisory Service Agreement, or the SPS, WMS or SMA programs[17] . . . .

Settlement Agreement at 7-8. That definition is expansive, but the Settlement Agreement goes on to exclude certain claims from the definition's purview. The Settlement Agreement states that "'Released Claims' shall <u>not</u> include suitability claims <u>unless</u> such claims are alleged to arise out of the common course of conduct that was alleged, or could have been alleged, in the Action, as more fully described herein." <u>Id.</u> at 8 (emphases added).

---

[17] The SPS ("Strategic Portfolio Service"), SMS ("Separately Managed Account"), and WMS ("Wealth Management Service") programs "encompassed all of Ameriprise's managed, fee-for-service accounts or programs in which clients paid a percentage fee for services that included financial advice, financial planning, or other financial advisory services." Appellee's Br. at 21 n.3 (internal quotation marks omitted).

As we explain above, supra note 3, suitability claims are often brought "as a distinct subset" of section 10(b) claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). See Dodds, 12 F.3d at 351. Ameriprise argues that the Belands do not advert to any specific federal statute, or even the term "suitability," in their FINRA Complaint. And indeed, before the district court, the Belands explicitly disavowed any reliance on federal securities law. Therefore, says Ameriprise, the Belands did not "actually assert[] suitability claims before FINRA." Appellee's Br. at 26 (emphasis in original) (internal quotation marks omitted). However, particularly because of the lack of a definition of the term in the Class Settlement, for the purposes of this appeal we consider "suitability" to serve more as a general description of the character of potential common-law claims (such as breach of fiduciary duty, breach of contract, fraud, and negligent misrepresentation -- all of which the Belands did allege in the FINRA proceedings), rather than a technical term denoting a specific type of section 10(b) claim. See also infra note 17. Furthermore, we note that although the Belands also disclaim reliance on state securities laws, regulations issued by the State of Illinois -- the state where the Belands filed their FINRA Complaint -- define "unsuitab[ility]" with reference to "fraud[], decepti[on,] [and] manipulati[on]." Ill. Admin. Code tit. 14, § 130.853.

The Belands point to several aspects of their FINRA Claims that demonstrate that not all of them are Released Claims barred by the Class Settlement. First, they argue that their claims span a time period matching that of the existence of their trusts -- from 1995 to 2009 -- while the Release covers only claims between 1999 and 2006. Second, the Belands argue that while the Class Settlement "plainly relate[s] to [claims involving the] sale and promotion of proprietary and affiliated mutual funds for which [Ameriprise] was receiving kickbacks or promoting in-house," Appellants' Reply Br. at 3, the Settlement Agreement's express exclusion of "suitability claims" covers the substance of many of their FINRA Claims, which allege that "the conservative goal of both the Charitable Remainder and Revocable Trusts was not followed" and "individual speculative 'tech' securities were bought and sold," Appellants' Br. at 27; see also Appellants' Reply Br. at 6 (arguing that the Belands' FINRA Claims include "suitability claims unique to the recommendations of Ameriprise broker Ron Miller -- claims related both to misrepresentation and recommendations having nothing to do with American Express mutual funds and shelf space proprietary products").

Ameriprise counters that the Belands' FINRA Claims "fall squarely within the definition of 'Released Claims.'" Appellee's Br. at 20. Regardless of any minor differences, Ameriprise contends, the FINRA Claims "plainly 'arise from the

47

same transactions, facts, matters, occurrences, and representations as the claims of the [Class Complaint].'" Id. at 21 (quoting Order and Final Judgment at 2). Ameriprise also rejects the Belands' attempt to rely upon the "suitability claims" carve-out in the Class Settlement, inasmuch as the Belands' FINRA Complaint did not explicitly label or otherwise characterize any of their claims as being "suitability" claims.[18]

We agree with the Belands, however, that their FINRA Claims and the Released Claims do not -- indeed, cannot -- entirely overlap. First, the Belands' FINRA Complaint unequivocally alleges that Ameriprise and Miller agreed to invest the Belands' funds "in a conservative fashion, preserving capital and obtaining income from which the life beneficiaries could receive a return," FINRA Complaint ¶ 9, but that "[a] conservative asset allocation approach was not taken," id. ¶ 13. That seems to us to be a quintessential suitability claim. See Kearney v. Prudential-Bache Sec., Inc., 701 F. Supp. 416, 429

_____

[18] Ameriprise also contends that the Belands' suitability-claim argument has been forfeited because they did not raise it until they filed their Motion for Reconsideration before the district court. However, though the Belands do not appear to have specifically referred to the "suitability" carve-out clause before that time, the Belands consistently contended that their FINRA Claims went well beyond any issue that was or could have been raised in the Class Action. We therefore decline to accept Ameriprise's waiver argument regarding the "suitability" carve-out clause in the definition of Released Claims. In any event, "[w]e retain 'broad discretion' to consider issues not timely raised below." Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 159 (2d Cir. 2003).

(S.D.N.Y. 1988) (describing a typical suitability claim as a broker's "invest[ment] in risky transactions contrary either to [an investor's] explicit directions or to her interests").

Second, although the definition of Released Claims does include suitability claims "aris[ing] out of the common course of conduct that was alleged, or could have been alleged, in the [In re AEFA litigation]," Settlement Agreement at 8, we read the "common course of conduct" alleged in the In re AEFA litigation to be, as described by the Belands, Ameriprise's routine practice of "steering American Express clients into Proprietary or Shelf Space funds through one or more of the managed programs at American Express," Appellants' Reply Br. at 4. Indeed, the Class consisted only of persons who purchased financial plans that invested in the Proprietary or Shelf Space Funds (as well as others who otherwise invested in those Funds). See Class Complaint ¶ 85. As the Class Notice explains, the class action involved investors who "were sold financial plans and/or advice that, instead of being tailored to their individual circumstances, contained standardized recommendations designed to steer them into investing in Defendants' proprietary mutual funds and other proprietary investment products and certain non-proprietary 'Preferred' or 'Select' mutual funds." Class Notice at 1. The Class Notice further explained that the basis of the class action was the notion that "conflicts of interest inherent in Defendants' financial plans and/or financial advisory

49

services, and the compensation arrangements between Defendants and the Preferred Funds, were inadequately disclosed to investors." Id. The Belands' claims that Miller mismanaged their trusts contrary to their instructions and investment goals do not fall within that "common course of conduct."

Third, the Belands' FINRA Complaint is also devoted in part to the allegation that once they confronted Miller about the accounts' declining assets, "Miller set a course of cover-up, lies and deceit in order to obscure the mishandling in the" accounts, providing false justifications for investment decisions and shielding the truth about Ameriprise's motives and conflicts of interest. FINRA Complaint ¶ 20; see also id. ¶¶ 25-27. Among those allegedly false reasons were the September 11 terrorist attacks and that the charitable trust was set to diminish "by design." Id. ¶¶ 21-24 (internal quotation marks omitted). Claims dependent upon allegations of this sort were plainly not Released Claims under the In re AEFA Class Settlement.

Fourth, there can be no question that the Belands' claims, to the extent that they involve conduct occurring after the Class Period, cannot be Released Claims.[19]

---

[19] That said, we do have some doubts about the time period allegedly at issue in the Belands' FINRA Complaint. While they represent that their claims against Ameriprise span from 1995 to 2009, John and Elaine did not become trustees or beneficiaries of the accounts until 2004. While claims predating their inherited interest in the Ameriprise accounts might not be Released Claims, we note that they still might not be valid if the Belands did not acquire an interest in the accounts prior to that time. However,

To be sure, some -- if not many -- of the allegations in the Belands' FINRA Complaint constitute Released Claims. For example, they allege that "[a]lmost from the start, rather than invest in conservative large cap stocks, paying good dividends as well as substantial bond portfolios, Miller and Ameriprise invested in many house American Express mutual funds including various high yield junk bond funds." FINRA Complaint ¶ 14 (emphasis added). Similarly, they allege that Ameriprise "has managed [the Belands' accounts] in a fashion . . . designed primarily to generate fees and income for Ameriprise. . . [and] to promote in-house mutual funds of American Express." Id. ¶ 13. To the extent the FINRA Complaint contains similar claims, the claims are conclusively Released Claims and are, as such, barred.

However, the Belands also clearly allege in their FINRA Complaint that Ameriprise invested in "risky small cap or start-up funds" that "exposed" the Belands' accounts "to tremendous market risk which was unsuitable for the[ir] account objectives." Id. ¶¶ 13-14 (emphasis added). And while the In re AEFA Class Period lasted from March 10, 1999 to April 1, 2006, the Belands' complaint stretches all the way into 2009. Those claims, we conclude, are not Released Claims and therefore are not barred by the In re AEFA Class Settlement.

D. Conclusion

_____

that is a determination we leave for further factfinding by the arbitrators.

51

To summarize:  Ameriprise consented to arbitrate disputes with the Belands -- its customers -- by virtue of its membership in FINRA.  FINRA Rule 12200 is a broad provision that clearly encompasses the Belands' FINRA Claims, as they indisputably "arise[] in connection with the business activities of" Ameriprise and Miller.  FINRA Code § 12200.  Even if it were a closer question, because the issue would be one of "the construction of the contract language itself," we would "resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration. . . .'"  Republic of Ecuador, 638 F.3d at 393 (quoting Moses H. Cone, 460 U.S. at 24–25) .

The scope of an agreement to arbitrate is a "question of arbitrability" within the purview of the court, and therefore we can properly undertake the task of determining the breadth of Ameriprise's consent to arbitrate.  In our view, the Settlement Agreement "modif[ied]" Ameriprise's "fundamental and broad commitment," through its FINRA membership, "to arbitrate any dispute," Bechtel do Brasil Construções Ltda. v. UEG Araucária Ltda., 638 F.3d 150, 155 (2d Cir. 2011) (emphasis in original), with the Belands.  Specifically, the Settlement Agreement altered Ameriprise's prior expansive commitment to arbitrate by removing the Released Claims from the scope of that commitment.

We therefore conclude that Ameriprise (1) has not agreed to arbitrate the Released Claims as defined in the

Settlement Agreement, but (2) that it has agreed to arbitrate any non-Released Claims asserted in the Belands' FINRA Complaint.

## VI. District Court's Remedial Power

### A. Power to Enjoin Arbitration

The question "of whether federal courts have the power to stay arbitration under the FAA (or any other authority) in an appropriate case" is an open one in this Circuit. Republic of Ecuador, 638 F.3d at 391 (citing Westmoreland Capital Corp. v. Findlay, 100 F.3d 263, 266 n.3 (2d Cir. 1996), abrogated on other grounds by Vaden v. Discover Bank, 556 U.S. 49 (2009)). But see In re U.S. Lines, Inc., 197 F.3d 631, 639 (2d Cir. 1999) ("In the bankruptcy setting, congressional intent to permit a bankruptcy court to enjoin arbitration is sufficiently clear to override even international arbitration agreements."); Video Tutorial Servs., Inc. v. MCI Telecomms. Corp., 79 F.3d 3, 5 (2d Cir. 1996) (per curiam) (failing to reach the issue but noting that "[w]e would be hard-pressed to say that a district court cannot stay arbitration for a short time while familiarizing itself with the issues underlying a proposed motion to stay a suit pending arbitration, or a proposed motion to stay an arbitration"). But we find no indication that this issue was contested in the district court proceedings, and it was left unaddressed in both briefing to and oral argument before us. However, it is not one we think we can ignore simply because the parties have not squarely presented it to the Court. Although it is not a

question upon the answer to which our jurisdiction depends, we view it as one we ought to address inasmuch as it implicates "the remedial powers of the court," Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 90 (1998) (emphasis in original), to issue the Enforcement Order. See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 719 (2d Cir. 2010). In the words of another court, the issue represents "a high order challenge":

> On the one hand, a realistic concern for the finality and integrity of judgments would arise if parties were free to ignore federal court decisions that have conclusively settled claims or issues now sought to be arbitrated. Yet, arbitration is a matter of contract and the FAA only authorizes a limited review of the parties' intent before compelling or enjoining arbitration.

Olick, 151 F.3d at 138(internal quotation marks omitted).

While the FAA's terms explicitly authorize a district court to stay litigation pending arbitration, see 9 U.S.C. § 3, and to compel arbitration, see id. § 4, nowhere does it explicitly confer on the judiciary the authority to do what the district court's Enforcement Order purported to do here: enjoin a private arbitration.

Our decisions do suggest, however, that, at least where the court determines -- pursuant to the first step outlined in ACE Capital, 307 F.3d at 28, discussed above -- that the parties have not entered into a valid and binding arbitration agreement, the court has the authority to enjoin the arbitration

54

proceedings. See United States v. Eberhard, No. 03 Cr. 562, 2004 WL 616122, at *3, 2004 U.S. Dist. LEXIS 5029, at *10 (S.D.N.Y. Mar. 30, 2004) ("[W]here courts in this Circuit have concluded that § 4 of the FAA permits the issuance of a stay [of a private arbitration], . . . they appear to have done so only in those circumstances where a stay would be incidental to the court's power under the FAA to enforce contractual agreements calling for arbitration . . . ."). In Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30 (2d Cir. 2010), we affirmed a district court's order preliminarily enjoining a FINRA arbitration from proceeding. Id. at 40. In that case, the district court had "serious questions" as to whether one party was in fact a "customer" of a FINRA member (which status, as we observed above, would bind the other party to arbitrate). Id. at 33–34 (internal quotation marks omitted). We concurred with that assessment, concluding that the "customer" status of the party was an "issue . . . in sharp dispute." Id. at 39 (internal quotation marks omitted). In other words, we doubted the existence of a binding agreement to arbitrate in that case.

We have also affirmed a district court's stay of arbitration after determining that the initiation of judicial proceedings in a foreign country constituted a waiver of a plaintiff's right to arbitration, see Zwitserse Maatschappij van Levensverzekering en Lijfrente v. ABN Int'l Capital Mkts. Corp.,

55

996 F.2d 1478, 1480-81 (2d Cir. 1993) (per curiam), as we have a stay of arbitration over various claims that we held were not within the scope of an arbitration agreement, even while affirming an order compelling arbitration of related validly arbitrable claims, see Collins & Aikman, 58 F.3d at 23. Both of those cases, in addition to Citigroup Global Markets, suggest that a federal court may enjoin an arbitration that the court determines is not otherwise valid. See also SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P., 49 F. Supp. 2d 331, 341–42 (S.D.N.Y. 1999) (enjoining an arbitration in a case arising under the New York Convention, 9 U.S.C. §§ 201-208, after finding that such arbitration was "inappropriate" because the plaintiff had "waived any right it previously had to arbitrate the issues in th[e] case").

The First Circuit's opinion in Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co., 643 F.2d 863 (1st Cir. 1981), is instructive. There, the court considered a party's argument that the FAA "removes the district court's power to enjoin [an] arbitration." Id. at 867. The court first noted that the FAA "expressly provides federal courts with the power to order parties to a dispute to proceed to arbitration where arbitration is called for by the contract." Id. at 868 (citing 9 U.S.C. § 3). It inferred that "to enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is

56

present." Id. The court concluded that "[t]o allow a federal court to enjoin an arbitration proceeding which is not called for by the contract interferes with neither the letter nor the spirit of" the FAA. Id.; see also PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990) ("If a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, it is obliged to enjoin arbitration."), overruled by implication on other grounds by Howsam, 537 U.S. 79.

We confirm and apply those principles here. If the parties to this appeal have not consented to arbitrate a claim, the district court was not powerless to prevent one party from foisting upon the other an arbitration process to which the first party had no contractual right. As is clear from the Supreme Court's and this Circuit's cases, "[a]rbitration under the [FAA] is a matter of consent, not coercion." Volt, 489 U.S. at 479; see also Howsam, 537 U.S. at 83 ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (internal quotation marks omitted)). It makes little sense to us to conclude that district courts lack the authority to order the cessation of an arbitration by parties within its jurisdiction where such authority appears necessary in order for a court to

enforce the terms of the parties' own agreement, as reflected in a settlement agreement.  We decline to do so here.[20]

---

[20] We pause to note that we are relying on a reading of the FAA, FINRA Rule 12200, and the Settlement Agreement.  The particular circumstances presented in this appeal -- with emphasis on the exclusive nature of the In re AEFA district court's retention of jurisdiction over the Settlement Agreement -- persuades us that the district court here could properly enjoin the private arbitration of claims already settled and released by class members such as the Belands.

However, the All Writs Act, 28 U.S.C. § 1651(a), authorizes federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions."  See Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1099 (11th Cir. 2004) ("In allowing courts to protect their 'respective jurisdictions,' the [All Writs] Act allows them to safeguard not only ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments." (footnotes omitted)).  Some courts have explicitly relied upon the All Writs Act in enjoining arbitrations in similar circumstances to those before us in this appeal.  See, e.g., In re Y & A Grp. Sec. Litig., 38 F.3d 380, 382, 382-83 (8th Cir. 1994) (relying in part on the All Writs Act in concluding that "[n]o matter what, courts have the power to defend their judgments as res judicata, including the power to enjoin or stay subsequent arbitrations"); Hartley v. Stamford Towers Ltd. P'ship, Nos. 92-16802 & 92-56528, 1994 WL 463497, at *3-*4, 1994 U.S. App. LEXIS 23543, at *12 (9th Cir. Aug. 26, 1994) (unpublished opinion) (noting that the All Writs Act's "grant of authority includes jurisdiction to enforce a class action judgment" by enjoining an arbitration, and one party's "participation in the arbitration process cannot affect the District Court's authority to enforce its judgments"); see also, e.g., Eberhard, 2004 WL 616122, at *3 n.6, 2004 U.S. Dist. LEXIS 5029, at *12 n.6 ("If this Court does not choose to exercise [its] power here, it is not for lack of such power but because the NASD arbitrations have not been shown to interfere with the Court's jurisdiction.").  But see Klay, 376 F.3d at 1102-03 ("The simple fact that litigation involving the same issues is occurring concurrently in another forum does not sufficiently threaten the court's jurisdiction as to warrant an injunction under the" All Writs Act.).

We thus do not decide whether the dictates of the All Writs Act might, in another case without the type of jurisdictional retention present here, give a district court "the authority to

58

B. Application to Enforcement Order

The Supreme Court has made clear that "[t]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985) (emphasis added); see Moses H. Cone, 460 U.S. at 20 ("[F]ederal law requires piecemeal resolution when necessary to give effect to an arbitration agreement." (emphasis in original)); Collins & Aikman, 58 F.3d at 20; see also Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005) ("When a dispute consists of several claims, the court must determine on an issue-by-issue basis whether a party bears a duty to arbitrate."). It is therefore appropriate for us -- and the district court -- to treat the Belands' Released and non-Released FINRA Claims differently.

Because we have concluded that a district court may properly enjoin arbitration proceedings that are not covered by a valid and binding arbitration agreement, and because we have further determined that no such agreement exists in this case as to the Released Claims, we find no error in, and therefore affirm, that portion of the district court's Enforcement Order

enjoin arbitration to prevent re-litigation," Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 985 F.2d 1067, 1069 (11th Cir. 1993), rev'd in part on other grounds by Howsam, 537 U.S. 79.

that enjoined the Belands' FINRA Arbitration as to the Released Claims.

However, as we have also discussed, the Belands' FINRA Complaint contains various claims not encompassed by -- indeed, in certain cases specifically excluded by -- the Release. Those non-Released Claims include claims based on, inter alia, unsuitable investment in technology stocks, misrepresentations and omissions regarding those investments, and claims involving alleged conduct falling outside the Class Period. Because Ameriprise's consent to arbitrate, even as amended (i.e., limited) by the Settlement Agreement, continues to embrace the non-Released Claims, the district court -- to that extent only -- lacked the authority to enjoin the arbitration of the Belands' FINRA Claims. Therefore, we vacate the portion of the Enforcement Order that purported to enjoin the Belands from presenting those claims to the FINRA arbitrators. We remand this matter to the district court for entry of an appropriately limited order enjoining only the arbitration of the Released Claims.

## CONCLUSION

For the foregoing reasons, we affirm that portion of the district court's judgment enjoining the Belands from arbitrating their Released Claims before FINRA arbitrators, and we vacate that portion of the court's judgment enjoining arbitration of any non-Released Claims. In light of our

60

disposition of this appeal, we dismiss as moot the Belands' appeal from the district court's denial of their motion for reconsideration.  We remand for further proceedings.

Each party shall bear his, her, or its own costs.