## VALDIN INVESTMENTS CORP., Plaintiff,

v.

**OXBRIDGE CAPITAL MANAGEMENT, LLC, Oxbridge Capital Fund I, LLC, Oxbridge Capital Fund II, LLC, Oxbridge Capital Fund III, LLC, Oxbridge Capital Fund IV, LLC, Oxbridge Capital Fund V, LLC, Oxbridge Capital Fund VI, LLC, Oxbridge Capital Fund VII, LLC, Oxbridge Capital Fund VIII, LLC, and Oxbridge Capital Fund IX, LLC, Defendant.**

No. 08–cv–4325 (ADS).

United States District Court, E.D. New York.

Signed May 26, 2015.

---

Jeffrey L. Rosenberg & Associates, LLC by Jeffrey L. Rosenberg, Esq., of Counsel, New York, NY, for the Plaintiff.

Arkin Solbakken Rice LLP by Alan R. Arkin, Esq., of Counsel, New York, NY, for the Defendants.

## ORDER

SPATT, District Judge.

On February 27, 2015, the Plaintiff Valdin Investments Corp. (the "Plaintiff") filed a motion to enforce (i) a stipulation of settlement so ordered by this Court on March 5, 2009 (the "First Stipulation"); (ii) an order of attachment so ordered by this Court on the same date (the "Attachment Order"); and (iii) a second stipulation of settlement entered into by the parties on February 11, 2010 (the "Second Stipulation," and collectively, the "Settlement Orders").

This case had been administratively closed since March 6, 2009.

In its present motion, the Plaintiff alleges that the Defendants Oxbridge Capital

Management, LLC, Oxbridge Capital Fund I, LLC, Oxbridge Capital Fund II, LLC, Oxbridge Capital Fund III, LLC, Oxbridge Capital Fund IV, LLC, Oxbridge Capital Fund V, LLC, Oxbridge Capital Fund VI, LLC, Oxbridge Capital Fund VII, LLC, Oxbridge Capital Fund VIII, LLC, and Oxbridge Capital Fund IX, LLC (collectively, the "Defendants") breached the terms of the Settlement Orders.

In light of the alleged breaches by the Defendants, the Plaintiff seeks (i) an order re-opening this case and "directing [the] Defendant and others to submit to and provide all appropriate discovery to aid in the Motion to Enforce and to establish damages"; and (ii) an award of legal fees and costs incurred by the Plaintiff in filing this motion.

For the reasons set forth below, the Court denies the motion by the Plaintiff and directs the Clerk of the Court to continue to mark this action as closed.

## I. BACKGROUND

### A. The Parties

The Plaintiff is a Panama corporation with its principal place of business also located in Panama. (Compl. at ¶ 3.) The Plaintiff does not set forth its business in detail other than to state that it provides "investment advisory services." (Id. at ¶ 4.) Lance Valdez ("Valdez") owned and controlled the Plaintiff prior to its alleged dissolution on August 10, 2010. (Sweeney Decl. at ¶ 18.)

The Defendant Oxbridge Capital Management, LLC ("Oxbridge Capital") is a New York limited liability company with its principal place of business located in Valley Stream, New York. (Compl. at ¶ 18.) It manages funds that use money from investors to invest in "structured, over the counter, European-style, cash-settled equity barrier call options." (Id. at ¶¶ 5, 18; Answer at ¶¶ 5, 18.) It is not clear from the record what "equity barrier

call options" are, nor is it clear how they function.

From 2003 through 2005, Oxbridge Capital formed the following funds for the purpose of carrying out its investments: the Defendants Oxbridge Capital Fund I, LLC, Oxbridge Capital Fund II, LLC, Oxbridge Capital Fund III, LLC, Oxbridge Capital Fund IV, LLC, Oxbridge Capital Fund V, LLC, Oxbridge Capital Fund VI, LLC, Oxbridge Capital Fund VII, LLC, Oxbridge Capital Fund VIII, LLC, and Oxbridge Capital Fund IX, LLC (collectively, the "Funds"). (Compl. at ¶ 14; Compl., Ex. A; Answer at ¶ 14.) They are also New York limited liability companies. (Id.)

### B. Summary of Investments

The purpose of each of the Funds is to solicit investor money and to use that money to purchase equity barrier call options. (Rosenberg Decl., Ex. B, at 1.) The value of each Fund is determined based on the performance of the options that the Fund purchases. (Id.) Thus, if the options purchased by the Fund perform well, then the Fund will be worth more money, and investors, in turn, will make a profit. (See id.) If the options do not perform well, then the Fund will be worth less, and the investors will not make a profit. (See id.)

Oxbridge Capital manages each Fund. (Id. at 5) In compensation for its work, it receives a Management Fee from each Fund equal to .75% of the value of the options purchased. (Id.) This fee is paid to Oxbridge Capital on a quarterly basis on June 30th and December 31st of each year. (Id.) In addition, Oxbridge Capital receives an Incentive Fee of 5% of any annual net gain in the value of the Fund during any fiscal year in excess of the first 5% of such gain. (Id.) That means that if the Fund has an annual net gain of less than 5%, Oxbridge Capital will not receive

an Incentive Fee. (*See id.*) If the Fund gains more than 5% in a given fiscal year, Oxbridge Capital will receive an Incentive Fee.

## C. The Investment Advisory Agreements

From 2004 through 2007, each Fund entered into separate letter agreements with the Plaintiff that had nearly identical terms (the "Advisory Agreements"). (Compl. at ¶ 27.) Under the terms of the Advisory Agreements, the Plaintiff agreed to "act as Investment Advisor ... with respect to the selection, reallocation, monitoring and termination of ... over-the-counter, European-style, cash settled equity barrier call options." (Rosenberg Decl., Ex. A, at 1.) Oxbridge Capital, the manager of each Fund, agreed to pay the Plaintiff "at the rate of $75,000 per year ... in equal semi-annual increments of $37,500 on or about the times Oxbridge Capital Management, LLC received payments of its Management Fees[.]" (Rosenberg Decl., Ex. A, at 1.)

The term of each Advisory Agreement is "coincident with the term of the Options initially purchased by [the Fund], subject to termination on such earlier date as the Options may be entirely terminated and liquidated in accordance with their terms." (*Id.* at 1.) In addition, the Advisory Agreements provide the Funds with the right to terminate the Advisory Agreements "immediately upon notice to [the Plaintiff] if the Financial Institution gives Oxbridge a 'Barrier Notice' (or similar notice) calling for the payment of additional premium under the Confirmation (or similar document) setting forth the terms of the Options." (*Id.*)

The Advisory Agreements also give both the Funds and the Plaintiff the right to terminate the contracts "after the first anniversary of the date of the initial purchase of the Options by [the Funds]" upon thirty days written notice from the terminating party. (*Id.* at 1.) If Oxbridge Capital terminates the agreements under the terms of this provision, it must also pay a $225,000 termination fee. (*Id.*)

## D. The Procedural Background

### 1. The Complaint

On October 23, 2008, the Plaintiff commenced this action against the Defendants to recover compensation fees allegedly due to them under the Investment Advisory Agreements. (Compl. at ¶ 32.) The Plaintiff asserted common law claims against the Defendants for (i) breach of contract; (ii) breach of fiduciary duty; and (iii) an accounting of management fees it received. (Compl. at ¶¶ 41–59.)

### 2. The Motion by the Plaintiff for an Order of Attachment

On November 26, 2008, the Plaintiff moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 64 and Section 6201 of the New York Civil Practice Law and Rules ("CPLR") for an order of attachment, which sought to require the Defendants "to make and provide for adequate capital reserves for the payment of [the] Plaintiff's reasonably anticipated damages." (Rosenberg Decl., Dkt. No. 9, at ¶ 2.)

■ Under Rule 64, attachment is available in the manner provided by the law of the state in which the district court proceeding is pending. "New York law requires that a plaintiff seeking attachment must show by affidavit (1) that there is a cause of action, (2) that there is a probability of success on the merits, (3) that a ground for attachment listed in [CPLR] § 6201 exists, and (4) that the amount demanded from defendants exceeds all counterclaims known to plaintiff." *Flame S.A. v. Primera Mar. (Hellas) Ltd.*, No. 09

CIV. 8138(KTD), 2010 WL 481075, at *4 (S.D.N.Y. Feb. 2, 2010); *see also Capital Ventures Int'l v. Republic of Argentina,* 443 F.3d 214, 222 (2d Cir.2006).

CPLR § 6201, in turn, provides that the "an order of attachment may be granted where ... the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in [the] plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts."

In support of the Plaintiff's motion, Jeffrey L. Rosenberg ("Rosenberg"), counsel for the Plaintiff, submitted a declaration stating that Robert Eide, President of Oxbridge Capital, told him during a telephone conversation that Oxbridge Capital did not intend to pay the Plaintiff its fees under the Advisory Agreements and indicated that Oxbridge Capital planned to dissolve the Funds in January 2009. (Rosenberg Decl., Dkt. No. 9, at ¶ 23, 24.)

On December 30, 2008, the Court denied the Plaintiff's motion without prejudice but granted it leave to re-file the motion in compliance with the Court's Individual Rules. (Dkt. No. 16.) The Plaintiff did not re-file its motion.

### 3. The First Stipulation

On March 6, 2009, the Court so-ordered the First Stipulation entered into by the parties to settle and discontinue this action, with prejudice.

The First Stipulation states that the Plaintiff was not paid for its services during three periods: (i) July 1 through December 31, 2007 ("Period I"); (ii) January 1 through June 30, 2008 ("Period II"); and (iii) July 1 through December 31, 2008 ("Period III"). (Rosenberg Decl., Ex. C., at p. 2.)

Under the terms of the First Stipulation, the Defendants agreed to pay the Plaintiff $625,000 to compensate the Plaintiff for the services it provided to the Defendants during Periods I and II. (*Id.* at ¶ 2, p. 3.) For the investment services provided by the Plaintiff to the Defendants in Period III, the Defendants were required to pay the Plaintiff "ten (10%) of any and all fixed, incentive and other compensation" that Oxbridge Capital receives as Management and Incentive Fees for operating the Funds. (*Id.* at ¶ 3(a), p. 4–5.)

The First Stipulation further provides for the payment of the Plaintiff's fees going forward from the date of the First Stipulation. In that regard, for the period January 1, 2009 through December 31, 2009, the Plaintiff is entitled to receive 10 % of "all fixed, incentive and other compensation [that] Oxbridge [Capital]" and the Funds are entitled to receive. (*Id.,* at p. 5) From January 1, 2010 "until the expiration and/or termination of the Investment Advisory Agreements," the Plaintiff is entitled to receive 20% of the compensation earned by the Defendants with respect to the management and performance of the Funds. (*Id.* at p. 5.)

Further, the Defendants agreed to pay the Plaintiff an additional sum of $50,000 for the "reimbursement of a portion of the legal fees it incurred in initiating and prosecuting this action[.]" (*Id.* at ¶ 4, p. 10.)

> In addition, the parties agreed:

> to the retention of subject matter and *in personam* jurisdiction by the Court as to all aspects of the within litigation and for all purposes to enforce any and all terms of this Stipulation of Settlement; even after the Defendants may perfect their right hereunder to have the captioned matter discontinued in accordance with the terms herein set forth.

(*Id.* at ¶ 8, p. 14.)

Finally, the Defendants agreed to consent to a separate stipulation of attachment to be approved by the Court "[t]o

provide Valdin with security for the timely payment and or performance of all obligations due or becoming due hereunder, and for the payment of any amounts hereinafter becoming due under the Investment Advisory Agreements." (*Id.* at ¶ 5, 11–12.)

### 4. The Attachment Order

On March 6, 2009, the same day that the Court signed the First Stipulation, the Court also issued the Attachment Order. (Rosenberg Decl., Ex. C.) The Attachment Order provides:

> [I]n connection with any dissolution and/or liquidation of any and all of the [Funds] listed in the caption in this action, each such Fund and Oxbridge [Capital] shall create and maintain a reserve for the payment of sums reasonably anticipated to be required to be paid to [the Plaintiff], pursuant to either or both the terms of the [First] Stipulation and/or the Investment Advisory Agreement between Valdin and each of such Oxbridge Funds, which reserves shall in all respect be ... remain in conformity with the requirements of New York Limited Liability Company Law § 704.

(*Id.* at 1.) The Attachment Order further states that "the failure to maintain such reserve for the purposes stated shall constituted a violation of this Order and a material Default under the terms of the [First Stipulation]." (*Id.* at 2.)

### 5. The Second Stipulation

On February 11, 2010, the parties entered into the Second Stipulation. (Rosenberg Decl., Ex. D.) The Second Stipulation states that the Defendants "failed to timely remit the compensation due to be paid to [the Plaintiff] for ... [services provided in] Period III, ... January 1 through December 31, 2009." (*Id.* at p. 3.)

In consideration for the Plaintiff's agreement not to seek the full amount of damages in connection with the Defendants' breaches of the First Stipulation, the Defendants agreed to pay the Plaintiff a total of $188,263.75. (*Id.* at ¶ 3(a), p. 5–6.) These damages were comprised of: (i) $76,689.08 for services performed by the Plaintiff during Period III; (ii) $53,737.17, representing the balance of the Plaintiff's legal fees; (iii) $7,837.50 in additional legal fees incurred in negotiating the Second Stipulation; and (iv) $50,000 in "exemplary liquidated damages." (*Id.*)

The Second Stipulation was not provided to or approved by this Court. However, it contains a provision for the Court's jurisdiction. (*Id.* at ¶ 6, at p. 7.)

### 6. The Alleged Dissolution of the Plaintiff and the Death of Valdez

On August 10, 2010, Plaintiff filed a notice of dissolution. (Schoenmann Decl. at ¶ 2.)

On November 22, 2012, Valdez, the former owner of the Plaintiff, died from "a [h]elicopter crash in which [he] was a passenger." (Sweeney Decl. at ¶ 4.)

### 7. The Present Motion

On February 27, 2015, the Plaintiff filed a motion seeking an order from the Court (i) finding that the Defendants violated the Settlement Orders; (ii) granting the Plaintiff additional discovery to "garner and obtain all information and materials ... to establish and delineate [the Plaintiff's] compensatory and punitive damages in connection with the [alleged] breach of and violation of the [Settlement] Orders"; (iii) awarding legal fees and costs to the Plaintiff incurred in connection with the present motion; and (iv) "for such other and different relief as may be deemed just and proper by this Court." (The Pl.'s Notice of Mot. at 1–2.)

## II. DISCUSSION

### A. *Legal Standards*

#### 1. Jurisdiction

■ As an initial matter, the Court must determine whether it has jurisdiction over the Plaintiff's motion to enforce the Settlement Orders. "A federal court does not automatically retain jurisdiction to hear a motion to enforce or otherwise apply a settlement in a case that it has previously dismissed." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 134 (2d Cir.2011) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)). That is because "[s]uch motions are essentially state-law contract claims." *Id.*

■ "Where, however, the federal court makes 'the parties' obligation to comply with the terms of the settlement agreement ... part of the order of dismissal— either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order'—that court is a proper forum for litigating a breach of the settlement agreement." *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 305 (2d Cir.2014) (quoting *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 134). In those cases, the "district court necessarily makes compliance with the terms of the settlement agreement a part of its order so that 'a breach of the agreement would be a violation of the order,' and the district court may therefore enforce the settlement as an exercise of its ancillary jurisdiction to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* (internal quotation marks and citations omitted).

■ Here, the Court clearly has ancillary jurisdiction over a motion to enforce the Attachment Order because that is an order issued by this Court. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379, 114 S.Ct. 1673, 1676, 128 L.Ed.2d 391 (1994) ("Generally speaking, we have asserted ancillary jurisdiction ... to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."); *see also Vill. of W. Hampton Dunes v. New York*, 89 F.Supp.3d 433, 443, No. 14–CV–3299 (ADS)(AKT), 2015 WL 868966, at *9 (E.D.N.Y. Mar. 2, 2015) (Spatt, J) ("[A] federal court can exercise ancillary jurisdiction over those claims and actions which are necessary to effectuate its own judgments.") (quoting *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 104–05 (2d Cir. 2001)).

The Court also finds that it has jurisdiction to enforce the First Stipulation because the Court so-ordered it, and the stipulation contains language expressly retaining the jurisdiction of this Court to enforce its terms. (March 6, 2009 Stipulation, Dkt. No. 42, at ¶ 8, p. 14.); *see also Hendrickson v. United States*, No. 82–CV–621T (MAT), 2014 WL 1224715, at *6 (W.D.N.Y. Mar. 25, 2014) ("[B]ecause Courts retain ancillary jurisdiction to enforce their own Orders, this court has retained jurisdiction over the enforcement of the Order issued April 29, 1985 approving the settlement of this action.").

The Court did not so-order the Second Stipulation. However, the Second Stipulation expressly incorporates the terms of the First Stipulation and also has a provision providing for the jurisdiction of this Court. (Rosenberg Decl., Ex. D, at ¶ 6, at p. 7.) Accordingly, the Court also finds that it has ancillary jurisdiction to enforce the Second Stipulation. *See Partners for Payment Relief, LLC v. Dreambuilder Investments, LLC*, No. 12–CV–1414 (RJS), 2014 WL 7014349, at *1 (S.D.N.Y. Dec. 11, 2014) ("As an initial matter, the [c]ourt rejects [the] [d]efendants' contention that

the [c]ourt lacks jurisdiction to resolve [the] [p]laintiffs' motion because the [c]ourt never 'so ordered' the Settlement Agreement. Such an explicit [c]ourt endorsement was unnecessary in order for the [c]ourt to retain jurisdiction to enforce the Settlement Agreement.").

### 2. The Standard of Proof

The Plaintiff labels its present request for relief as a "motion to enforce" the Settlement Orders. (Rosenberg Decl. at ¶ 1.) It seeks an order "directing the Defendants and others to submit to and provide all appropriate discovery to aid in the Motion to Enforce and to establish damages" and "an award of legal fees." (*Id.*)

Although the Court has ancillary jurisdiction to enforce its own orders, the Second Circuit in *Martens v. Thomann*, 273 F.3d 159, 172 (2d Cir.2001) made clear that "there is nothing in the Federal Rules of Civil Procedure styled a 'motion to enforce.'" It further noted that the proper procedural vehicle for relief under a settlement order depends on the type of relief that a plaintiff is requesting:

> There are, for example, many ways in which the performance of a class action settlement might be called into question before the district court: (i) in a contempt proceeding (if the claim is that the district court's orders are not being complied with); (ii) in a new action for breach of contract (if the claim is that one or more parties are not living up to their obligations under the settlement stipulation); (iii) or in a motion for relief from judgment under Fed.R.Civ.P. 60(b) (if an amendment of the original judgment is being requested).

*Id.* at 172.

Here, it is not entirely clear what procedural vehicle the Plaintiff is moving under. The Plaintiff does not appear to seek imposition of a civil contempt order, which requires a movant to demonstrate the adverse party's non-compliance by clear and convincing evidence. *See New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989) ("A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply."); *see also Clarkson v. Goord*, No. 91 CIV. 1792, 2014 WL 4290699, at *3 (S.D.N.Y. Aug. 29, 2014) (" 'The imposition of a civil contempt order is a severe sanction subject to a higher standard of proof than the 'preponderance of the evidence' standard applicable to ordinary cases.' ") (quoting *King v. Allied Vision Ltd.*, 155 F.R.D. 440, 448 (S.D.N.Y.1994)).

Nor does the Plaintiff appear to request relief under Fed.R.Civ.P. 60(b), a procedural vehicle used to relieve "a party or its legal representative" from the effects of a "final judgment."

Rather, the Plaintiff requests additional discovery as to "damages" and attorneys' fees pursuant to Paragraph 7 of the First Stipulation, which provides for such fees in the event of a default by the Defendants. Both of these forms of relief are based on an assumption that the Defendants breached the terms of the Settlement Orders.

■ In cases where movants seek relief for breach of a settlement stipulation by another party, courts typically require the movant to show that the opposing party breached the settlement stipulation by a preponderance of the evidence, as courts would require in ordinary breach of contract actions. *See, e.g., Canada Dry Delaware Valley Bottling Co. v. Hornell Brewing Co.*, No. 11 CIV. 4308(PGG), 2013 WL 5434623, at *7 (S.D.N.Y. Sept. 30, 2013) ("[The plaintiff] bears the burden of proving by a preponderance of evidence that

[the defendant] violated the Judgment."); *United States v. Visa U.S.A., Inc.*, No. 98 CIV. 7076(BSJ), 2007 WL 1741885, at *4 (S.D.N.Y. June 15, 2007) ("Because contempt standards do not govern the instant proceedings, MasterCard must demonstrate only by a preponderance of the evidence that Visa's SSF violates the Final Judgment.").

Accordingly, the Court finds that in order to succeed in its motion for additional discovery and attorneys' fees, the Plaintiff must show, by a preponderance of the evidence, that the Defendants breached the Settlement Orders.

### 3. Choice of Law

■ "It is well established that '[s]ettlement agreements are contracts and must therefore be construed according to general principles of contract law.'" *Collins v. Harrison–Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir.1999)). Accordingly, the Court must decide what state's contract law should be applied to interpret the claims by the Plaintiff that the Defendants breached the Settlement Orders.

State law issues arise most often in diversity cases, where a federal court must apply the principles of the forum state in determining which law should apply to a plaintiff's claims. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir.2012) ("A federal court sitting in diversity . . . must apply the choice of law rules of the forum state.") (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989)). However, as noted above, here, the Court has ancillary jurisdiction—and not diversity jurisdiction—over the Plaintiff's claims for breach of the Settlement Orders. Nevertheless, the Court sees no reason why it should not apply New York choice of law principles to the state law issues raised by the Plain-

tiff's claims. *See Garshman v. Universal Res. Holding, Inc.*, 641 F.Supp. 1359, 1371–72 (D.N.J.1986) ("The instant matter is not a diversity case; the court has ancillary jurisdiction over Universal's crossclaim, which needs no independent jurisdictional basis. The court sees no reason, however, why it should not apply New Jersey's choice of law rules to the state law issues raised by the crossclaim."). As such, the Court will apply New York choice of law principles to determine what law should be applied to the Plaintiff's claims.

■ "'Under New York choice-of-law [principles], the first step of the analysis is to determine whether there is a substantive conflict between the laws of the relevant choices.'" *Long Beach Rd. Holdings, LLC v. Foremost Ins. Co.*, 75 F.Supp.3d 575, 586, 2015 WL 627904, at *9 (E.D.N.Y. 2015) (Spatt, J) (quoting *Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F.Supp.2d 504, 509 (S.D.N.Y.2009)).

Here, the briefs of both parties assume that New York law controls this dispute. Moreover, the Defendants are all New York limited liability companies, and the alleged failure by the Defendants to comply with the Settlement Orders took place in New York. Accordingly, the Court will apply New York law to the Plaintiff's claims. *See Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) ("The parties' briefs assume that New York law controls this dispute, and such 'implied consent . . . is sufficient to establish choice of law.'") (quoting *Tehran–Berkeley Civil & Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989)); *United Merch. Wholesale, Inc. v. IFFCO, Inc.*, 51 F.Supp.3d 249, 263 (E.D.N.Y.2014) (Spatt, J) ("The parties' assumption in their briefs that New York State law gov-

erns constitutes implied consent to its application to the merits of this case.").

### 4. Capacity

As an initial matter, the Defendants assert that pursuant to Fed.R.Civ.P. 17 the Plaintiff lacks capacity to bring the present motion because it filed a notice of dissolution on August 10, 2010.

Fed.R.Civ.P. 17(b) states that the "[c]apacity to sue or be sued ... for a corporation is determined ... by the law under which it was organized." Since the Plaintiff is a Panama Corporation, the Defendants contend that the Panama law governs whether the Plaintiff has the capacity to bring the present motion. (The Defs.' Mem. of Law at 8–10.) According to the Defendants, Chapter IX of the Republic of Panama General Corporation Law of 1927 ("Panama General Corporation Law") provides: "All corporations ... shall nevertheless continue to exist for the term of three years from such expiration or dissolution for the purpose of prosecuting or defending suit by or against them." (*Id.* at 8.)

As there is no dispute that the Plaintiff filed a notice of dissolution on August 10, 2010, the Defendants assert that the time period during which the Plaintiff could move to enforce the Settlement Orders expired under the Panama General Corporation Law on August 10, 2013. (*Id.*) The Court finds this argument to be problematic for two reasons.

First, the Defendants do not attach a copy or translation of Chapter IX of the Panama General Corporation Law. Nor do they offer the opinion of an expert in Panama law. Rather, they provide what is presumably a translation of the Panama General Corporation Law in their memorandum of law. Without more, the Court is reluctant to accept the translation of the Panama General Corporation offered by the Defendants.

Second, even assuming that the Defendants' translation of Chapter IX of the Panama General Corporation law is accurate, the Plaintiff had not dissolved at the time that it initiated this action on October 23, 2008. In this regard, the Court finds *Domino Media, Inc. v. Kranis*, 9 F.Supp.2d 374, 381 (S.D.N.Y.1998) to be instructive.

In that case, the plaintiff, a Colorado corporation, obtained a malpractice judgment against the defendant, its former attorney, in a previous case. *Id.* However, prior to obtaining the judgment, the plaintiff dissolved. *Id.* The plaintiff then commenced a separate action to set aside fraudulent conveyances made by the defendant after the judgment. *Id.* at 378–79. The court rejected the defendant's argument that the plaintiff lacked the capacity to bring a separate action to enforce a judgment because it had dissolved. *Id.* As the plaintiff had not dissolved at the time of bringing the underlying action, the Court found that the Colorado dissolution statute to be not applicable to the plaintiff's motion. The court then analyzed Colorado common law and policy to determine that under Colorado law, a dissolved corporation has the capacity to initiate a separate proceeding to enforce a judgment obtained in an action that was timely commenced prior to its dissolution. *Id.* at 384.

■ Here, as in, *Domino,* Plaintiff timely commenced this suit and entered into the Stipulation Orders prior to its dissolution. Moreover, similar to the Colorado law cited by the defendants in *Domino,* the translation of Chapter IX of the Panama General Corporation Law offered by the Plaintiff only appears to bar dissolved companies from initiating suits. The provision does not answer the question at issue here—namely, whether a corporation that obtained a court-ordered settlement agreement prior to its dissolution, can file

a motion to enforce the agreement after it has dissolved. As such, based on the undeveloped factual record before it, the Court declines to find that the Plaintiff lacks the capacity to bring the instant motion. The Court will now turn to the merits of the Plaintiff's breach claims.

### B. As to the Attachment Order

■ Under New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998) (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994)).

The Plaintiff contends that the Defendants breached the Attachment Order by failing to setup "sufficient capital reserves" from February 11, 2010, when the parties entered into the Second Stipulation, to the present.

In response the Defendants argue that (1) there is no evidence that the Defendants failed to maintain the reserves required under the Attachment Order; and (2) the Plaintiff's dissolution freed the Defendants of any obligation to maintain adequate reserves. (The Defs.' Opp'n Mem. of Law at 16–18.) The Court agrees with the Defendants' first argument, and, therefore, it need not address the Defendants' second argument.

On November 26, 2008, the Plaintiff moved pursuant to Fed.R.Civ.P. 64 and CPLR Section 6201 for an order of attachment, which sought to require the Defendants "to make and provide for adequate capital reserves for the payment of [the] Plaintiff's reasonably anticipated damages." (Rosenberg Decl., Dkt. No. 9, at ¶ 2.)

Under the terms of the First Stipulation, the Defendants consented to "entry of an Order granting [the] Plaintiff all of the relief request pursuant to [the] Plaintiff's Attachment Motion, ... provided, however, that [the] Defendants further consent and agree that such Order shall expressly encompass and be applicable to any amounts due and becoming due under this Stipulation of Settlement, and/or under the Investment Advisory Agreements." (Rosenberg Decl., Ex. C, at ¶ 5, p. 11.)

In turn, on March 6, 2009, the Court so-ordered an Attachment Order submitted by the parties, which stated:

in connection with any dissolution and/or liquidation of any and all of the Oxbridge Funds listed in the caption to this action, each such Fund and Oxbridge Management shall create and maintain a reserve for the payment of sums reasonably anticipated to be required to be paid to [the Plaintiff], pursuant to either or both the terms of the [First] Stipulation and/or the Investment Advisory Agreement between [the Plaintiff] and each of such Oxbridge Funds, which reserves shall in all respects ... remain in conformity with the requirements of New York Limited Liability Company Law § 704.

(Rosenberg Decl., Ex. D.) The Attachment Order further states that "the failure to maintain such reserves for the purposes stated shall constitute a violation of this Order and a material Default under the terms of the Stipulation." (*Id.*). Thus, a violation of the Attachment Order is a breach of the First Stipulation.

In support of its breach claim, the Plaintiff primarily relies on a November 18, 2011 letter from Michelle Rice ("Rice"), the Defendants' then-counsel, to Rosenberg, counsel for the Plaintiff, in which she states:

We hereby confirm that .... reserves [pursuant to the terms of the Attachment Order] have been established for Oxbridge I, III, IV, VII, and IX. Howev-

er, as you are well aware, the Order of Attachment only applies to those funds that are in liquidation. Oxbridge II, V and VIII are not in liquidation and Oxbridge VI has a negative equity position at this time.

(Rosenberg Decl., Ex. G.) As Rice admitted that reserves were not established for Oxbridge Funds II, V, VI and VIII, the Plaintiff asserts that the Defendants are in breach of the Attachment Order.

In response, the Defendants assert that the plain language of the Attachment Order and extrinsic evidence indicates that the Defendants were only required to maintain reserves in the event that they decided to liquidate or dissolve the Funds. (The Defs.' Opp'n Mem. of Law at 16–17.) As Rice clearly stated in her letter that reserves were not maintained for Oxbridge Funds II, V, VI and VIII because they were "not in liquidation," the Defendants argue that the Plaintiff has failed to show that they breached the Attachment Order. The Court agrees.

Under New York law, "[i]n determining what the parties intended, 'a court should look first within the 'four corners' of the document' and should 'give effect to the 'plain and ordinary' meaning of its language.' " *Two Locks, Inc. v. Kellogg Sales Co.*, 68 F.Supp.3d 317, 328 (E.D.N.Y. 2014) (quoting *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F.Supp.2d 118, 128 n. 9 (S.D.N.Y.2000)); *see also Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 555, 450 N.Y.S.2d 460, 435 N.E.2d 1075, 1078 (1982) ("[W]e remember that, in searching for the probable intent of the parties, lest form swallow substance, our goal must be to accord the words of the contract their 'fair and reasonable meaning' ") (quoting *Heller v. Pope*, 250 N.Y. 132, 164 N.E. 881 (1928)).

Further, "an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaning-

less . . . is not preferred and will be avoided if possible.' " *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir.2005) (quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir.2003)) (alteration in original).

In addition, under New York law, " '[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous.' " *Two Locks, Inc.*, 68 F.Supp.3d at 328 (quoting *RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V.*, 18 F.Supp.3d 534, 541 (S.D.N.Y.2014)); *see also Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (N.Y.2002) (same). "Ambiguity . . . is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir.2008) (citing *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993)).

The language of the Attachment Order at issue here provides,

*in connection with any dissolution and/or liquidation* of any and all of the Oxbridge Funds listed in the caption to this action, each such Fund and Oxbridge Management shall create and maintain a reserve for the payment of sums reasonably anticipated to be required to be paid to [the Plaintiff], . . . *which reserves shall in all respects . . . remain in conformity with the requirements of New York Limited Liability Company Law § 704.*

(Rosenberg Decl., Ex. D.) (emphasis added).

The first clause of this provision—"in connection with any dissolution and/or liquidation"—appears to modify the obligation in the second provision—"each such Fund and Oxbridge Management shall cre-

ate and maintain a reserve for the payment of sums reasonably anticipated to be required to be paid to [the Plaintiff]." Moreover, courts have found that the plain meaning of "[i]n connection with" is "related to." *See In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 442 (Bankr.S.D.N.Y. 2012) ("It is proper to construe the phrase 'in connection with' broadly to mean 'related to.'"); *In re Interbulk, Ltd.*, 240 B.R. 195, 202 (Bankr.S.D.N.Y.1999) ("A natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'"). Thus, a natural reading of the first clause of the provision suggests that the Defendants' obligation to create and maintain reserves is solely related to any dissolution and/or liquidation.

This interpretation is bolstered by the last clause of the provision: "which reserves shall in all respects ... remain in conformity with the requirements of New York Limited Liability Company Law § 704." Section 704 of the New York Limited Liability Company Law ("NYLLC Law") provides that "[u]pon the winding up of a limited liability company," the assets of that company should be distributed first to "creditors ... whether by payment or by establishment of adequate reserves" and then to "to members and former members [of the company] in satisfaction of liabilities for distributions." In other words, NYLLC Law § 704 is only triggered in the event that a limited liability company is dissolved. *See Cardinale v. 267 Sixth St. LLC*, No. 13 CIV. 4845 JFK, 2014 WL 4799691, at *8 (S.D.N.Y. Sept. 26, 2014) ("N.Y. Limited Liability Law § 704 ... deals with distribution of assets upon dissolution."). Thus, the reference in the last provision to NYLLC Law § 704 also suggests that the Defendants are only required under the Attachment Order to "create and maintain" reserves in the event that the Oxbridge Capital decides to liquidate or dissolve the Funds.

On the other hand, the Plaintiff's interpretation of the Attachment Order renders the language discussed above to be meaningless. A result that courts in this Circuit must avoid. *See Bristol–Myers Squibb Co. v. Matrix Labs. Ltd.*, 586 Fed. Appx. 747, 751 (2d Cir.2014) ("This Court will not adopt an interpretation that has 'the effect of rendering at least one clause superfluous or meaningless ... if possible.'") (quoting *LaSalle Bank Nat'l Ass'n*, 424 F.3d at 206). Thus, considering the structure and plain meaning of the Attachment Order, the Court finds that the Defendants' interpretation of the Attachment Order—that they are responsible for maintaining reserves only in the event of dissolution or liquidation—is the only reasonable interpretation.

 Based on this interpretation, the Plaintiff fails to offer any persuasive evidence that the Defendants breached their obligation under the Attachment Order. As noted above, the Plaintiff relies primarily on a November 18, 2011 letter from Rice to Rosenberg:

> We hereby confirm that .... reserves [pursuant to the terms of the Attachment Order] have been established for Oxbridge I, III, IV, VII, and IX. However, as you are well aware, the Order of Attachment only applies to those funds that are in liquidation. Oxbridge II, V and VIII are not in liquidation and Oxbridge VI has a negative equity position at this time.

(Rosenberg Decl., Ex. G.)

However, the Defendants were not required to maintain reserves for funds that were not in liquidation. As such, the admission by Rice that the Defendants did not maintain reserves for Oxbridge II, V, VI, and VIII because those funds were not in liquidation, does not provide evidence that the Defendants breached the Attachment Order, as the Plaintiff contends.

The only other evidence of a breach offered by the Plaintiff is an allegation that Alan R. Arkin ("Arkin"), the Defendants' current counsel, attempted to "disband" reserves set up by the Defendants in a separate state court proceeding. (Rosenberg Decl. at ¶ 4.) Allegedly, this state court proceeding involved "the acrimonious and vitriolic breakup of the Defendant's [sic] prior counsel's law firm." (*Id.* at ¶ 6.) The Plaintiff does not explain why the issue of reserves setup by the Defendants would be an issue in a state court proceeding involving Arkin's law firm that presumably had nothing to do with the instant case. Nor does the Plaintiff attach any document filed in the state court proceeding that provides evidence that Arkin made such a request. Rather, the allegation is "based solely on Information [sic] and belief" and a few conversations that Rosenberg had with Rice, Arkin's adversary in the state court proceeding. (*Id.* at ¶ 7, n. 10.) Such vague and conclusory allegations fall well short of establishing that the Plaintiff breached the terms of the Attachment Order.

Accordingly, the Court finds that the Plaintiff has failed to meet its burden to establish, by a preponderance of the evidence, that the Defendants breached the Attachment Order.

### C. As to the First Stipulation

Finally, the Plaintiff asserts that the Defendants breached the First Stipulation by failing to make payments under the Settlement Orders after August 12, 2010, when the Plaintiff last received a payment from the Defendants. (The Pl.'s Reply Mem. of Law at 9–10.)

The Defendants respond that the First Stipulation and the Advisory Agreement contained an implied condition that if the Plaintiff dissolved or ceased to exist, the Defendants would be relieved of any obligations to provide the Plaintiff with compensation going forward. (The Defs.' Opp'n Mem. of Law at 18.) As neither party disputes that the Plaintiff dissolved on August 10, 2010, the Defendants assert that they had no obligation to pay the Plaintiff after that date. The Court agrees.

As the Defendants correctly point out, courts have found that if the performance by one party to a contract becomes impossible by reason of its death or dissolution, the contract is deemed terminated or unenforceable. *See, e.g., 407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.,* 23 N.Y.2d 275, 280, 296 N.Y.S.2d 338, 244 N.E.2d 37 (N.Y.1968) ("Under familiar rules a promise that a party will continue to remain in business may be implied in fact as part of an agreement for the rendition of services to a business."); *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.,* 568 F.Supp.2d 329, 340 (S.D.N.Y.2008) ("Thus insolvency, bankruptcy, dissolution of defendant's business, retirement from business, impossibility of performance and breach of contract are examples of events which would terminate performance by means of the destruction of the contract rather than by fulfillment of its express terms.") (quoting *Dundee Wine & Spirits, Ltd. v. Glenmore Distilleries Co.,* 238 F.Supp. 283, 286 (S.D.N.Y.1965)); *Suminco S.A. v. Great Lakes Carbon Corp.,* No. 89 CIV. 0686(RO), 1995 WL 33602, at *3 (S.D.N.Y. Jan. 30, 1995) ("Under, the law, if a contract envisions that its continuing performance depends upon the personal services of one particular person, and that by reason of death or otherwise such becomes impossible, the contract is deemed terminated or unenforceable.") (quoting *Spalding v. Rosa,* 71 N.Y. 40 (1877)).

In the present case, under the terms of the Investment Advisory Agreements, each Fund agreed to compensate the Plaintiff for "act[ing] as Investment Advis-

or for [the Funds] with respect to the selection, reallocation, monitoring, and termination of" the options purchased by each Fund. (Rosenberg Decl., Ex. A, at p. 1.) As the Plaintiff was required to provide a service to the each Fund—namely, investment advisory services—the Court finds the Advisory Agreements to be service contracts, pursuant to which the Plaintiff's continued existence was essential to its ability to perform its obligations.

There is no dispute that the Plaintiff filed a notice of dissolution on August 10, 2010. Moreover, there is no evidence to suggest that the Plaintiff, or any of its affiliates, was able to perform services for the Defendants after its dissolution. Thus, the Plaintiff's dissolution appears to have precluded it from performing its obligations under the Advisory Agreements. Accordingly, the Court finds that the Defendants were not obligated to compensate the Plaintiff after its dissolution on August 10, 2010. *See Suminco S.A.*, 1995 WL 33602 at *3 ("Under, the law, if a contract envisions that its continuing performance depends upon the personal services of one particular person, and that by reason of death or otherwise such becomes impossible, the contract is deemed terminated or unenforceable.") (quoting *Spalding v. Rosa*, 71 N.Y. 40 (1877)). As the Defendants have paid the Plaintiff for its services up until the date of its dissolution on August 10, 2010, the Court finds that the Plaintiff has also failed to show, by a preponderance of the evidence, that the Defendants breached the payment terms of the Investment Advisory Agreements and the First Stipulation.

In sum, the Court finds that the Plaintiff has failed to offer any evidence that the Defendants breached the Settlement Orders. Therefore, the Court denies the Plaintiff's motion for attorneys' fees and to re-open this case for discovery regarding damages for the Defendants' alleged breaches.

### III. CONCLUSION

For the foregoing reasons, the Court denies the motion by the Plaintiff for additional discovery and for attorneys' fees. The Clerk of the Court is directed to maintain this case as closed.

**SO ORDERED.**